## ST. JOHN et al. v. BROWN et al.
### Civil No. 227.

District Court, N. D. Texas,
Fort Worth Division.
March 28, 1941.

Davidson, McMahon & Smart, of Abilene, Tex., for plaintiffs.

Curtis E. Hill, of Dallas, Tex., for defendants.

Gerard D. Reilly, Sol. of Labor, Irving J. Levy, Asst. Sol., Llewellyn B. Duke, Regional Atty., and George B. Searls, Sr. Atty., all of Washington, D. C. (David Persinger and Walter T. Nolte, both of Washington, D. C., of counsel), for Philip B. Fleming, Administrator of Wage & Hour Division, U. S. Department of Labor.

WILSON, District Judge.

The questions to be decided arise under the Fair Labor Standards Act, Title 29 U. S.C.A. § 201 et seq. It really involves, as to hours and wages, whether ordinary oil field workers came under Federal control, upon the effective date of the Act.

The plaintiffs, St. John-Choate et al. and St. John-Choate Gathering System, separate partnerships composed practically of the same personnel, primarily filed this suit under the Declaratory Judgments Act, Title 28, Sec. 400, U.S.C.A., Judicial Code Section 274d. The former owned and operated a small oil property known as the Amity Oil Field, located in Comanche County, Texas. The latter owned a pipe line gathering system, by which it took this oil, as produced, from the tanks on the lease, and delivered it some five miles distant to the pipe line of Humble Oil & Refining Company, the purchaser of same, which in turn through its pipe line transported it to the Texas Gulf Coast. There it was refined into various products, and ultimately a considerable percentage of it passed out of the State as interstate commerce.

There are seven of the defendants. They constituted the entire field crew depended upon by the partnerships to get the oil out of the ground and into commerce. They are called roughnecks, roustabouts, pumpers and gaugers. Some of them do a combination of work, such as might be implied from those titles. In any event, they do all of the work necessary to produce the oil and get it to market. Plaintiffs, to prevent a multiplicity of suits and possible penalties, sought to have this Court declare the rights of the respective parties under the said Hours and Wages Act. The idea was if the law was held to be applicable to such work, they could then amicably arrange any matter of payment of overtime, etc., thereby avoiding penalties, attorneys fees, etc.

A very fair picture of the plaintiffs' view is given in the fifth paragraph of their complaint, as follows: "Said plaintiff alleges that said Amity Oil Field in Comanche County, Texas, comprehends approximately 240 acres under production; that same has approximately 40 wells located thereon; that all of said wells are what is known in oil field parlance as 'stripper wells'; that is to say they produce less than 10 barrels of oil per day each; that the gathering system owned by said plaintiff consists of approximately five miles of two inch pipe, which runs from storage tanks located in said Amity field and runs to storage tanks approximately five miles away erected in close proximity to the pipe line system of Humble Oil & Refining Company; that said gathering system is privately owned and no oil is transported therein or permitted to enter therein except oil in which the plaintiffs filing this suit have an interest; that said gathering system does not enjoy the status of a common carrier under the laws of the State of Texas and is not subject to regulation or control by the Railroad Commission of the State of Texas as a pipe line;

that the total volume of oil transported and carried by said gathering system is approximately 200 barrels per day, and its existence was necessary in order that the oil in which plaintiffs have an interest might readily be transported and carried to a point where same would be available for purchase by Humble Oil & Refining Company which owns a pipe line at the termination of said gathering system, and results in saving plaintiffs the cost and expense of trucking and otherwise transporting said oil to a point where same can be sold; that said gathering system is equipped with pumps to force the oil through the same, and in order that a proper accounting as to the amount and quality of said oil may be kept it is necessary that the storage tanks at each terminal of said gathering system be gauged so that the amount of oil going into said pipe line, its gravity and quality, and the amount of oil taken from the storage tanks at the end of said gathering system and its quality as received by the Humble Oil & Refining Company and purchased by it may readily be determined; that all of said transactions occur within the territorial limits of the State of Texas, and said plaintiff, upon disposal and sale of said oil to said Humble Oil & Refining Company, the purchasing pipe line company, loses all control over the same, same being a completed sale and transaction in Comanche County, Texas, and entirely within the territorial limits of the State of Texas; that all of the operations of said gathering system are private and intrastate in character, and on account of the small scale operations of said gathering system, due to the character of said wells and small production therefrom and small volume of oil transported and carried by said gathering system, and the fact that same is wholly owned by plaintiffs herein in various interests, the operations of said plaintiff in regard to said gathering system do not constitute a burden upon commerce and are not essential to the proper maintenance of commerce and, accordingly, do not constitute the production of goods for commerce and do not constitute engaging in commerce within the purview of what is commonly referred to as the Wages and Hours Law of the United States of America."

All seven of the defendants appeared and took issue with the plaintiffs as to the law not being applicable and in addition, each filed cross-claims for varying amounts of overtime. For convenience they will be referred to as defendants.

■ If one of the defendants was engaged in producing commerce, as defined by the Act, all were. Since the Supreme Court, February 3, 1941, held the Act to be constitutional in the case of United States v. Darby, 61 S.Ct. 451, 85 L.Ed. ——, it will only be necessary for this Court to consider whether it was the intent of Congress, as that may be gathered from the words of the Act, to embrace this kind of labor under its terms. Also the case decided the same day of Opp Cotton Mills, Inc., et al. v. Administrator of the Wage and Hour Division of the Department of Labor, 61 S.Ct. 524, 85 L.Ed. ——, is important.

The character of work done and the capacities in which defendants here served brings none of them under the exemptions of the Act. A mere reading of the statute makes it clear that such was the intent of Congress. It is not questioned that the plaintiffs are employers, the defendants employees, and the oil business an industry, as defined by the Act, if it is otherwise applicable. The pertinent provisions of the Act are as follows (I shall italicize those provisions of special importance):

"§ 206.(a) Every employer shall pay to each of his employees who is engaged in commerce or *in the production of goods for commerce* wages at the following rates— * * *." Then provides for the first year not less than 25 cents per hour, the following six years not less than 30, for the following seven years not less than 40, or as may be prescribed by the Administrator, etc.

"§ 207.(a) No employer shall, except as otherwise provided in this section, employ any of his employees who is engaged in commerce or *in the production of goods for commerce*— * * *." Then provides for a workweek not more than forty-four hours during the first year, forty-two the second year and not longer than forty hours after the expiration of that time, unless the employee receives compensation, for work in excess of such hours, "at a rate not less than one and one-half times the regular rate *at which he is employed*," etc.

To determine the meaning of the terms "engaged in commerce" and "production of goods for commerce" we have only to look to the definitions prescribed in the

Act. They are found in Sec. 203, the pertinent ones being:

"(b) 'Commerce' means trade, commerce, transportation, transmission, or communication among the several States or from any State to any place outside thereof. * * *

"(i) 'Goods' means goods (including ships and marine equipment), wares, products, commodities, merchandise, or articles or subjects of commerce of any character, or any part or ingredient thereof, but does not include goods after their delivery into the actual physical possession of the ultimate consumer thereof other than a producer, manufacturer, or processor thereof.

"(j) 'Produced' means produced, manufactured, mined, handled, or in any other manner worked on in any State; and for the purposes of this chapter an employee shall be deemed to have been engaged in the production of goods if such employee was employed in producing, manufacturing, mining, handling, transporting, or in any other manner working on such goods, or in any process or occupation necessary to the production thereof, in any State."

The reason those oil wells of the Amity field are called "stripper wells" is because about 10 barrels of crude oil seeps into them each twenty-four hours and is pumped out. To argue that these defendants as a group or organization, or individually, who pumped the oil and handled it, in a standardized way, to get it to a market, were not producing goods for commerce, is equivalent to arguing that a miner with his pick and lamp, who goes down to the end of the shaft and there knocks or blasts the already uncovered coal out of its bed and shovels it into a push car to be conveyed to the surface, is not producing goods for commerce. The only remaining essential is that, the crude oil or "parts or ingredients" of it as commerce passed beyond our State lines.

The fact that the partnership here, owning and operating the lease and actually producing the oil, sold it, when so produced, to the co-partnership that gathered and transported it to a market, however intrastate that transaction might be, does not affect the question.[1] The attitude of plaintiffs is, they had given the matter no thought and did not intend, or know, that their oil, or by-products of it, would pass into interstate commerce. They must be held to know that which is of such common knowledge that the courts may take judicial knowledge of it, viz., that the greater percentage of all crude oil produced in Texas, certainly such as finds its way into major pipe lines, goes out of our State, though it may be in the form of by-products, for ultimate consumption.[2] Also the evidence is that, a considerable percentage of all crude carried to the Gulf by the Humble in the pipe line that got this oil, in the form of by-products, goes interstate. I hold the law is applicable. I see no need of discussing the authorities, there are many, which support this view.[3]

The second question presented is a much more difficult one. Some of these defendants were paid by the month, some by the week, and some by the day. Plaintiffs insist if, what defendants were paid can be so

[1] Sunshine Mining Co. v. Carver, U.S. D.C.Idaho, 34 F.Supp. 274; Fleming v. Enterprise Box Co., U.S.D.C.Florida, 37 F.Supp. 331, decided Feb. 26, 1941; United States v. Darby Lumber Co., 61 S.Ct. 451, 85 L.Ed. ——; National Labor Relations Board v. Jones & Laughlin Steel Corp., 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893, 108 A.L.R. 1352; Santa Cruz Packing Co. v. Labor Board, 303 U.S. 453, 58 S.Ct. 656, 84 L.Ed. 954; Sunshine Anthracite Coal Co. v. Adkins, 310 U.S. 381, 60 S.Ct. 907, 84 L.Ed. 1263; United States v. Wilshire Oil Co., D.C.Cal., 9 F.Supp. 396; National Labor Relations Board v. Sunshine Mining Co., 9 Cir., 110 F.2d 780; Consolidated Edison Co. v. N. L. R. B., 305 U.S. 197, 59 S.Ct. 206, 83 L.Ed. 126; National Labor Relations Board v Fainblatt, 306 U.S. 601, 59 S.Ct. 668, 83 L.Ed. 1014; Wood v. Central Sand & Gravel Co., D. C., 33 F.Supp. 40.

See also paragraphs 4 and 5 of Interpretative Bulletin No. 5 issued by Administrator, Wage and Hour Division, United States Department of Labor.

[2] Fleming v. Enterprise Box Company, supra; Census of Manufactures, 1939; U. S. Bureau of Mines, Annual Petroleum Statement No. P. 202, pp. 3, 10, 14, 30, 36, 37, 65, 68–77.

[3] United States v. Darby Lumber Co., supra; Sunshine Mining Co. v. Carver, supra; Cotton v. Ottenheimer Bros., Inc., D.C.E.D.Ark., decided Jan. 6, 1941, no opinion; National Labor Relations Board v. Jones & Laughlin Steel Corp., supra; National Labor Relations Board v. Fainblatt, supra.

allocated as to cover the statutory minimum for the statutory maximum hours and, in addition, one and a half for all overtime, that such a salary meets the requirements of the law. The defendants and the Administrator of the Wage and Hour Division, who intervened, strongly contest that view. The proposition seems very plausible, but, unless such was an arrangement agreed to by the parties, my conclusion is, it is not a compliance, because perchance it might figure out that way. Since there is quite a little accounting in connection with the claim of each of the seven defendants, it will be impossible to here deal with them separately. By taking one of them for an example, I will lay down a formula by which a judgment may be worked out as to each of them, and will leave those details to the parties and their attorneys. Plaintiffs' counsel chose S. T. Zellars for an example. I will also. They say: "Let us take, for example, the defendant Zellars, who was employed by St. John-Choate Gathering System in the latter part of October, 1939. Zellars was employed as a pumper and gauger at the rate of $100.00 per month, for a contemplated work week of nine hours per day, seven days per week. Reducing $100.00 to a weekly wage, we find that $100.00 times twelve equals $1200.00, divided by fifty-two equals $23.08. Reducing this weekly wage to an hourly rate of pay, and at the same time giving due consideration to the maximum hours provision of Section 7 of the Wages and Hours Law, we find that the $23.08 per week is properly allocable as follows: At 31.4¢ per hour for the first 42 hours per week he would receive a total of $13.188. At one and one-half times this hourly rate, or 47.1¢ per hour, for the next twenty-one hours he would receive $9.891. That the total for the 63 hour week which he agreed to work would be $23.079."

Zellars did not work every week 63 hours. His hours ranged from 51 to 80, but 63 is taken because favorable to such an allocation. But for purposes of illustration it makes no difference. Were 80 taken, the straight through regular rate would be 28.7¢, obviously not enough to pay the minimum, say nothing of overtime.

The statement from the brief, though in minor points inaccurate, contains all of the material factors that enter into the problem. It is not enough that the salaries here, independent of the working contract, may be allocated or spread so as to cover the minimum and one and a half for overtime. It may even exceed the 30¢ minimum and the 45¢ for overtime and yet be a violation of the law. I am cited District Court opinions to the contrary, by my colleagues of this District; Reeves v. Howard County Refining Co., D.C., 33 F.Supp. 90, and A. H. Belo Corporation v. G. C. Street, Jr., et al., D.C., 35 F.Supp. 430. The opinions in these cases do not sufficiently give the facts for me to agree or disagree. Apparently they hold to the contrary of what I am holding. I have just received from defendants' attorneys an opinion by Judge Leonard W. Carr, Circuit Judge of Michigan in the case of Charles H. Boylan v. Liden Manufacturing Co., No. 13306. Though one page is unfortunately missing, he seems to hold exactly as I do on this question. Any judge has a perfect right, at this time, to his guess as to what constitutes labor in interstate commerce. None of us, in cases arising under recent laws, can be too certain as to what the law is until the Supreme Court declares it. And they in turn, are overruling some of their own prior decisions on the subject, with marked dissents.

As I have heretofore indicated, it is a matter of the intent of Congress. The key to the right answer is the true per hour wage of the employee. That must be determined, of course, by reference to the actual employment contract. That amount, whatever it is, represents the true regular rate of pay for each of the hours worked in a week. If over the minimum 30¢, which it is in Zellars' case, by multiplying the statutory hours, 42, by such actual hourly rate, it can readily be determined if there is enough left to pay one and a half times that hourly rate to cover every hour of overtime. Plaintiffs in their calculations do not attempt to arrive at any per hour wage under the contract of employment. By multiplying 100 by 12 and dividing by 52, that far being proper, they determine merely the weekly wage which is $23.08. Then it will be noted, they say they reduced the "weekly wage to an hourly rate of pay", but that is what they failed to do. They stop there. What they actually do at that point is to see if they can spread the $23.08 both ways so as to cover the maximum time of 42 hours at 30¢ and have 45¢ left to cover each hour, worked in a week, in excess of 42. If they have any money left they divide that in the same ratio, and add to the pay for regular time and overtime. On that erroneous basis plaintiffs' counsel figured and added correctly. They call the 31.4¢,

so arrived at, the regular rate of pay. As between the contracting parties it is purely a fictional rate of pay. The law so contemplates, but the parties in contracting did not intend that any one of the nine hours in a day's work would be paid for at a different rate from any other hour, but that every hour of the nine would be paid for at the same rate. Though this law was in effect, the employment contract was made without reference to it. It was not considered, as the parties testified. It is fair to them to say they had no idea it would be applicable to such work. Therefore, as between them, there was no overtime. Here, extra pay for overtime is a thing the law demands. Whatever that per hour contractual rate is figured to be, is the rate Congress had in mind when it said, "not less than one and one-half times *the regular rate* at which he is employed". The law did not become a part of these contracts. That is a general rule. In some cases it is applicable, but not here. The law exacts certain things and forbids others, and fixes civil and criminal penalties for its violation. Even the "one and one-half times" provision is akin to a penalty, intended to discourage overtime employment and to encourage a greater spread of employment.[4]

It must be remembered that Section 206 is a minimum wages Act, and 207 is a maximum hours Act; that they are really two Acts combined in the same bill, providing for a common administration, penalties, etc. In this particular connection we are construing Section 207. It provides the employer shall not employ any of his employees "for a workweek longer than forty hours after the expiration of the second year from such date, unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times *the regular rate at which he is employed.*"

The latter, or unless clause, is alike applicable to the first and second years. Zellars' employment nine hours a day, seven days a week, made a workweek of sixty-three hours. A thing plaintiffs should have done, but did not do, since the Act is both an hours and wages law, was to divide the weekly wage of $23.08 by 63. This makes a per hour regular rate of 36.6¢ straight through for the full sixty-three hours. To get at Zellars' lawful weekly wage, if the law is to be complied with, we must add to the $23.08 paid for a week's work, one-half of the regular hourly rate of 36.6¢ or 18.3¢ for each of the twenty-one hours of weekly overtime. This leaves a deficit of $3.84, for each of the forty-nine weeks worked by Zellars, to pay his overtime. Judgments may be worked out and prepared accordingly for him and the other defendants.

Section 216(b) provides as follows: "Any employer who violates the provisions of section 206 or section 207 of this chapter shall be liable to the employee or employees affected in the amount of their unpaid minimum wages, or their unpaid overtime compensation, as the case may be, and *in an additional equal amount as liquidated damages.*" This provision of the law is mandatory upon the courts, and the judgments must be drawn accordingly. This same section provides, in addition to awarding judgment to the employee, the court shall allow reasonable attorney's fees to be paid by the employer. I fix a fee of $35 for each of the defendants.

Since plaintiffs were struggling little oil companies, affording useful employment to neighbors in the little community of Amity, I realize this is a harsh and unjust judgment against them. It operates as a severe penalty for inability to understand a law, about which the lawyers of the country, and the judges as well, are sincerely differing. As stated heretofore, no one will know what the law is until it is declared by the Supreme Court. It is comparable to taking a man's valuable property away from him on a plea of limitations. It is no answer to say they are presumed to know the law. That is true, but applies equally to each side. If it be treated on the basis that defendants knew the law,

---

[4] The validity of such a method had long ago been sustained by the Supreme Court in Bunting v. Oregon, 243 U.S. 426, 37 S.Ct. 435, 61 L.Ed. 830, Ann.Cas. 1918A, 1043. The earlier drafts of the law contained absolute prohibitions on overtime work, but these were abandoned in the interests of flexibility. 82 Cong. Rec. 1696. See also 81 Cong.Rec. 7804, 7807, 7871, 7893, 7937, 7941, 8345–6; 82 Cong.Rec. 1391, 1395, 1401, 1415, 1470, 1480, 1486, 1490, 1505, 1601, 1672, 1797; Fleming v. Carleton Screw Products Co., U.S.D.C., Minn., 4th Div., 37 F.Supp. 754, decided March 13, 1941, Matthew M. Joyce, J.

since they made no request for higher wages, presented no accounts for overtime, and worked without expressing dissatisfaction, free to quit at any time, it would only make the picture, as relates to fair dealing, a worse one for them. But, as said before, all of the parties were in ignorance of what the law meant, in relation to this character of work. The judgments here rendered will be entirely out of proportion and have no relation whatsoever to the money actually earned by defendants. For example, in Zellars' case alone, plaintiffs will be penalized in a sum of approximately $375. And this, in spite of the fact that plaintiffs, if they had known the law was applicable, could have reduced his wages to less than $100 per month, and been clearly within the law. All of us are, or should be, for the rights and fair treatment of labor, but likewise for employers. Where they have the discretion, courts would like to uphold such an even balance of justice between them. But this is "a pound of flesh" they have no discretion to deny. Such injustices, as may result from the application of the law, are matters for Congress. If there are any difficulties with respect to the accounting matters, a hearing will be fixed at a time convenient to all.