## UNITED STATES v. TOWNSLEY.

No. 134. Argued December 12, 1944.—Decided January 15, 1945.

*Mr. Enoch E. Ellison*, with whom *Solicitor General Fahy, Assistant Attorney General Shea*, and *Mr. Julian R. Wilheim* were on the brief, for the United States.

*Mr. Herman J. Galloway*, with whom *Mr. Fred W. Shields* was on the brief, for respondent.

Mr. Justice Roberts delivered the opinion of the Court.

The parties agree that the principal question presented is whether Section 23 of the Independent Offices Appropriation Act, 1935,[1] in so far as it provides for overtime compensation for services in excess of 40 hours per week, applies to Government employes of the Canal Zone whose compensation is fixed on a monthly basis. The Court of Claims answered in the affirmative.[2] If we take the same view, a subsidiary inquiry is whether that court adopted the right method for calculating the overtime compensation.

The section, in full, is:

"The weekly compensation, minus any general percentage reduction which may be prescribed by Act of Congress, for the several trades and occupations, which is set by wage boards or other wage-fixing authorities, shall be reestablished and maintained at rates not lower than necessary to restore the full weekly earnings of such employees in accordance with the full-time weekly earnings under the respective wage schedules in effect on June 1, 1932: *Provided,* That the regular hours of labor shall not be more than forty per week; and all overtime shall be compensated for at the rate of not less than time and one half."

Between March 28, 1934, and August 31, 1939, the respondent was employed by the Panama Canal successively as operator, chief operator, and master of a dredge, and was paid on a monthly basis at rates fixed by the Governor of the Canal Zone upon recommendation of a wage board. The respondent's normal work week consisted of six 8-hour days. He retired August 29, 1939, and then, for the

---

[1] Act of March 28, 1934, c. 102, 48 Stat. 522; 5 U. S. C. 673c.

[2] 101 Ct. Cls. 237.

first time, asserted that under the Act he was entitled to compensation at the rate of time and one-half for all hours worked in excess of 40 per week. In prosecution of his claim he instituted this suit March 14, 1940.

The Court of Claims held that he was engaged in one of the "trades and occupations" whose compensation "is set by wage boards or other wage-fixing authorities" covered by the Act. We think this conclusion is right and do not understand the petitioner now to contest it. The court further held that the statute embraced those employes of the Canal Zone whose wages are paid on a monthly basis. This the Government contests, relying on the words of the Act, on administrative practice and on legislative history. A statement of the background of the legislation and its application seems necessary to decision.

In 1923 Congress adopted the "Classification Act"[3] classifying the employment and fixing the compensation for different classes of employes of certain departments of the Government. It excluded from the terms of the Act certain occupations, including apprentices, helpers or journeymen in a recognized trade or craft and skilled or semi-skilled laborers, among others. Admittedly, certain employes of the Panama Canal, including the respondent, were not covered by this Act. Their compensation was to be fixed by the President, or by his authority, under the Act of August 24, 1912;[4] specifically it was set by the Governor of the Panama Canal on the advice of a wage board.

The Act of March 28, 1934, with which we are here concerned, was the last of the so-called Economy Acts intended to decrease expenses by reduction of compensation

[3] 42 Stat. 1488 (5 U. S. C. 661, *et seq.*).

[4] c. 390, 37 Stat. 561, 48 U. S. C. 1305.

and suspension of privileges of federal employes. By the first such Act, approved June 30, 1932,[5] a regular schedule of reduction of salaries, by a system of furloughs or reduction of the work week, was established.

By the Act of March 20, 1933,[6] Congress superseded the furlough system and provided for a reduction, not to exceed 15%, in the compensation of all employes. By the Act of March 28, 1934, this reduction was cut to 10% for a portion of the fiscal year 1934, and to 5% for the fiscal year 1935. Possible reductions in compensation imposed on federal employes were not, however, limited to those prescribed in the cited statutes. Men were discharged and rehired in lower classifications at the lower wages applicable and were furloughed without pay, in order to keep within appropriations.

When the bill which became the Act of March 28, 1934 was under consideration, a representative of a labor organization appeared before a subcommittee of the Senate Committee on Appropriations and advocated legislation to prohibit certain discriminatory reductions in the wages of per diem Navy Yard workers. He pointed to the continuance of the practice of furloughing them one day in each two weeks, thus reducing the hours worked to 40 per week, and showed that this, in addition to the 15% reduction of pay required by the economy act then in force, actually cut their base pay over 22%. He also complained of other practices which had the effect of reducing their compensation. He expressed the fear that if Congress abolished the 15% level cut, wage boards would at once take action to reduce existing wage scales. He proposed a provision which would prohibit reduction of wages below the wage scales which were in effect June 1, 1932, but sug-

[5] 47 Stat. 382.
[6] 48 Stat. 8, 13.

gested no provision concerning hours of work or overtime pay. The draft he submitted was not embodied in the bill as reported.

Senator Thomas offered the present § 23 on the floor of the Senate, stating merely [7] "this amendment is offered to help the employees in the navy yards, the arsenals, the Panama Canal Zone, the Government Printing Office, and the Bureau of Engraving and Printing. It simply proposes to put them back on the same status they occupied in July of 1932 . . . the amendment adopted this afternoon restores their pay cut, it is true, provided that amendment remains in the law. This amendment proposes to give the employees of these several bureaus an increase in their pay even though they do not have to work an increased number of hours. At the present time they work 40 hours and get 44 hours' pay. Under the amendment it is possible that the board that has control of these employees will let them work 40 hours and they will possibly get 48 hours' pay, provided they get an increase of their hourly pay."

The amendment was adopted without further reference to it in either House of Congress. The President vetoed the bill, which was passed over his veto. On that occasion a Senator inquired whether certain language in the President's veto message referred to the provisions of § 23 and the reply was that the Senator interrogated did not know whether this was so. We shall shortly see that the section did substantially more than Senator Thomas stated in his brief explanation.

Prior to the effective date of the Act, the respondent's regular hours of work were 48 per week, though he was often required to work 52. Shortly after § 23 became law, the Governor of the Panama Canal requested the Comp-

---

[7] 78 Cong. Rec. 2977.

troller General to decide whether the section applied to employes of the Canal and whether it required payment of overtime to certain classes of employes, including the class to which respondent belonged. The Comptroller General ruled that the section was applicable to employes paid by the month as well as to those paid by the hour.[8] He did not directly rule on the right of monthly employes to be paid for overtime but his opinion indicates the view that they were not to be so paid since he stated: ". . . no change in the monthly or annual rate of compensation other than that required to pay a rate not lower than the rate per annum or per month paid June 1, 1932, less any applicable percentage reductions, would be authorized. That is to say, they are to receive the same monthly or annual compensation although their regular hours of duty may be reduced."

Notwithstanding this ruling, the Governor attempted to reduce the monthly employes' compensation by putting them on an hourly basis. This he did by dividing the monthly salary paid June 1, 1932, by 224, the number of hours he estimated they worked per month made up of eight hours per day for six days per week, sixteen hours per month for occasional overtime and an allowance for occasional work on Sundays and holidays. This computation showed they had been worked 52 hours per week. Having thus ascertained what he deemed their hourly wages, he added 20% to the hourly wage, so that they would receive the same amount for a 40-hour week as they would theretofore have received for a 48-hour week, despite the fact that they had been working and had been paid for more than 48 hours according to his computation of their prior hourly earnings. The net result was substantially to reduce their monthly earnings. After complaint by the employes, the Governor submitted

---

[8] See 14 Comp. Gen. 158.

his action to the Comptroller General and requested reconsideration of the earlier decision.[9] That official reaffirmed his prior decision and disapproved the recomputation of monthly wages which the Governor had adopted. He ruled that the proper procedure was "to continue the payment of the same monthly rates of compensation even though there may have been a reduction in the number of hours per week and no overtime compensation is authorized," and added that "This is the general rule that has been adopted under the 40-hour week statutory provision for all employees paid on a monthly or annual basis." The Governor's submission and the Comptroller General's ruling make it clear that both understood that employes paid on a monthly basis could not be regularly worked more than 40 hours a week. Several passages in his decisions also indicate that the Comptroller General was of opinion that monthly employes should not be paid overtime. The rulings were definitely that employes whose weekly wages would be reduced by reducing their work hours must have those wages restored to the 1932 wage level, and that employes who had not had their weekly wages cut because they were paid by the month and were worked 52 hours per week should not have their wages cut as a result of § 23 by the reduction of their work week to 40 hours.

Apparently relying on the Comptroller General's statement that employes on a monthly wage basis were not entitled to overtime, the Governor continued to work the respondent 48 hours a week but paid him no overtime. This in spite of his knowledge that the 40-hour week limitation was also applicable to the respondent if other parts of § 23 were so applicable. In his second submission to the Comptroller General he stated his understanding of the latter's decision that monthly employes

---

[9] See 14 Comp. Gen. 165.

could not be worked more than 40 hours a week. There is no evidence that the question of the legality of working the respondent overtime without paying him for it was ever submitted to the Comptroller General.

It seems evident that the Governor's action cannot be justified. If § 23 applied in the case of the respondent, his work week should have been 40 hours. If, in spite of § 23, his monthly stipend covered every day and every hour of the month whether service was rendered or not, as the Comptroller General had said, so that respondent could not be paid for overtime, then he should not have been regularly worked overtime.

With this outline of the situation, we are brought to a consideration of the Government's contention that § 23 has no application to the respondent's compensation.

We turn first to the suggestion that the expressions "weekly compensation" and "weekly earnings" control all of the provisions of the section and that hence both the affirmative provisions and the prohibition contained in the proviso apply only to those employes who receive weekly wages. As the record, however, fails to indicate that any of the Government employes were paid by the week, it is said that the term "weekly" was used as a method of adjusting the wages of per hour or per diem employes because a 40-hour work week could easily be calculated in their case as the measure of weekly work and compensation whereas it could not so readily be applied to monthly employes. But we think this suggestion does not comport either with the provisions or the obvious purpose of the legislation. The section commanded not only that wages reduced as a result of furloughs and uncompensated overtime should be reestablished but also that, for the future, such wages should be maintained at the June 1, 1932, level, subject only to the applicable percentage reductions provided by the Economy Acts. It sought to forbid indirect reduction of wages by the pro-

vision that a work week should consist of 40 hours and that overtime, at one and one-half the regular hourly pay, should be paid for any hours worked beyond that weekly limit. As the test of what should constitute overtime was more conveniently calculated by using a work week, and the hours worked during any week, it was quite natural that Congress should use the phrases "weekly compensation" and "weekly earnings" in setting a floor under wages.[10]

If the Government is right, § 23 had no application to respondent and those in like case and the Governor could have maintained a 52-hour work week at the old rate of pay or could have cut the work week with a corresponding reduction in pay. The result would be, as the court below pointed out, that an Act of Congress, on its face applicable to all employes, including monthly employes, which declared that the weekly wages of employes "shall be reestablished and maintained at rates not lower than" the 1932 rate would for the first time have authorized the cutting of the wages of monthly employes below the 1932 level while the wages of all others were being restored to that level. As we have seen, the Comptroller General ruled that such a cut in respondent's pay was "in contravention of the plain terms of the statute."

We are clear that the Comptroller General was right in ruling that the statute applied not only to per diem or hourly employes but also to employes paid on a monthly basis, such as respondent, whose compensation was fixed by a wage board. We are also clear that, on the face of the statute, if the Governor, in the teeth of the statutory provision, worked such employes more than 40 hours a week, the overtime provision of § 23 required payment

---

[10] Compare *Overnight Motor Co.* v. *Missel,* 316 U. S. 572; *Walling* v. *Helmerich & Payne,* 323 U. S. 37; *St. John* v. *Brown,* 38 F. Supp. 385; *Allen* v. *Moe,* 39 F. Supp. 5; *Nelson* v. *St. Joseph & G. I. R. Co.,* 199 Mo. App. 635, 205 S. W. 870.

at one and one-half straight time pay for the extra hours worked.

The Government seeks to avoid such a construction of the Act by invoking asserted administrative practice and legislative history. It relies heavily on the statement made to the subcommittee, to which we have heretofore referred. With respect to this statement, we think it enough to say that the spokesman was complaining about discriminations against employes paid by the day or the hour but he nowhere suggests the propriety of distinguishing between such employes and those paid on a monthly basis but worked more than 40 hours per week. He advocates setting the June 1, 1932, standard as a minimum subject only to percentage reductions provided by the Economy Act. He envisages the fact that if the work week is reduced to 40 hours and the June 1932 standard is thus reestablished, the result will be an increase in wages to the employes concerned. The considerations of equity on which he relies apply quite as much to employes paid by the month as to those paid by the day or hour. Moreover, as above stated, the draft he submitted was not adopted. On the contrary, one differently worded became § 23 of the statute.

The Government next relies on the fact that, prior to the adoption of § 23, no overtime was paid to employes who were on a monthly or annual basis. But, as we shall see, the full application of the principle of a work week limited to specified hours, and payment of overtime for extra hours, was gradually adopted by the Congress, and the fact that the old practice was abolished piecemeal can have little weight in determining whether, as respects the employes embraced in its terms, § 23 abolished the distinction amongst those embraced in trades and occupations whose compensation was fixed by wage boards. Moreover, the section essayed to deal only with a special class of employes whose working conditions are more

nearly comparable to those of men employed in private industry. They may, therefore, have been valid reason for establishing, as respects all of these employes, a different rule from that generally followed in Government departments.

The Government also relies on the prior practice in the Canal Zone, but we think this inconclusive. By the Act of August 24, 1912,[11] the President was empowered to appoint employes of the Canal Zone. The Act provided that "the compensation of such persons shall be fixed by the President, or by his authority, until such time as Congress may by law regulate the same" (§ 4). By Executive Order of February 2, 1914, the President established overtime for per diem and hourly workers but forbade overtime for those paid on a monthly or annual basis. Congress did undoubtedly legislate further on the subject in § 23 of the Act of 1934. The administrative practice prior to the adoption of the section is, therefore, of no moment.

The Governor's attempt to reduce the compensation of the respondent by working him overtime and not paying him for his overtime, in the teeth of the statute and the Comptroller General's ruling, certainly cannot be accorded weight in construing the statute.

The Government produced at the trial of the case in the court below certain letters from the Navy Department, the Government Printing Office, and the Bureau of Engraving and Printing of the Treasury Department stating that they had interpreted § 23 as applying only to per diem and hourly employes, and that no overtime had been paid to employes working on a monthly or yearly basis. These letters do not state, however, that these branches regularly worked such employes overtime, as did the Governor of the Canal Zone, without paying for overtime work.

---

[11] *Supra* Note 4.

Such evidence as there is in the record would seem to indicate the contrary.

The Secretary of the Navy submitted certain questions respecting § 23 to the Comptroller General immediately after the enactment of the section. One was whether per annum or per month employes who worked in excess of 40 hours a week "because of an extraordinary emergency" should be paid overtime. The Comptroller answered in the negative, referring to his decision rendered the Government Printing Office [12] in which he said that the regular hours of work of employes on an annual basis were required by § 23 to be fixed at not to exceed 40 per week. In the same opinion rendered to the Public Printer he had ruled that such employes were not entitled to overtime. There is no evidence that the Secretary of the Navy or the Public Printer conceived that they could work per annum and per month employes more than 40 hours a week without extra compensation except in cases of extraordinary emergency or that they ever pursued a practice like that of the Governor of the Panama Canal. It would seem, therefore, that the hours of monthly paid mechanical employes in the departments in question were reduced to 40 without any pay cut. Such action would be in accordance with the rulings of the Comptroller General. Thus the administrative construction of the Governor seems to stand alone and in contradiction to that of other heads of departments and offices of the Government, and, in this respect, worked a discrimination against the respondent and those in his class as contrasted with other employes who stood in the same relation. Certain it is that the Comptroller General never ruled that the standard of 40 hours a week with overtime could be disregarded in practice.

Finally, the Government argues that related legislation indicates Congress did not intend § 23 to apply to em-

---

[12] 13 Comp. Gen. 265.

ployes paid by the month or by the year. We think, however, that, on analysis, the course of legislation, considered as a whole, fails to sustain the contention. As we have said, adoption of the principle of limitation of working time and extra pay for overtime, in respect of Government employment, has been of gradual development.

As early as 1883 Congress authorized the Public Printer to pay extra prices in accordance with the customs of the trade and the justice of the case for extra work ordered in emergencies, performed on Sundays or legal holidays or at night, if performed by other than regular night forces.[13] It is assumed that the employes embraced in this legislation were paid per diem or per hour. The provision for payment of overtime in the Public Printer's office has been continued in the successive statutes.[14]

In 1888 Congress prescribed an 8-hour day with payment for overtime for letter carriers of the United States Postal Service,[15] who receive annual salaries.

In 1911 provision was made for overtime pay of employes of the Customs Service required by the nature of their service to work after 5 P. M.[16] Such overtime pay was to be reimbursed the Government by the steamship companies whose business required such services.

In 1919 the Secretary of Agriculture was authorized to pay employes of the Bureau of Animal Industry, employed in industrial establishments in the inspection of meat, for overtime work.[17] Here again the Government was to be reimbursed by the establishment which required the working of overtime, but the compensation paid the inspectors was on an annual salary basis.

---

[13] Act of January 13, 1883, 22 Stat. 402.

[14] See 44 U. S. C. 40.

[15] Act of May 24, 1888, 25 Stat. 157; cf. *United States* v. *Post,* 148 U. S. 124. See also 39 U. S. C. 117.

[16] Act of Feb. 13, 1911, § 5, 36 Stat. 901. See *United States* v. *Myers,* 320 U. S. 561.

[17] Act of July 24, 1919, 41 Stat. 241, 7 U. S. C. 394.

In 1940 an Act was passed [18] making the regular working hours of the Navy Department and the Coast Guard, and their field services "eight hours a day or forty hours per week" during the period of the national emergency. The Act set a different method of paying the overtime to monthly, per diem, hourly and piecework employes than that applied to employes paid by the year, but it is to be noted that the 40-hour week and the overtime rate of one and one-half times the regular rate was applied to monthly employes.

The Government lays great stress on a report of the Committee on Naval Affairs reporting this legislation to the Senate.[19] In that report the Committee said, referring to the 40-hour per week limit, and the payment for overtime: "In this regard, the provision for the payment of compensation [for overtime] to per annum and per month employes is a departure from the practice heretofore followed. . . ." A similar statement was made in the House report.[20] The difficulty that arises in giving weight to these statements of the Congressional Committees is that the facts already recited show the reports were wrong in fact and apparently were based upon an inaccurate statement which was credited by the Committees.

In the same year Congress passed another Act on the subject of overtime.[21] In this it was provided: "notwithstanding the provisions of any other law, compensation for employment in excess of forty hours in any administrative workweek computed at a rate not less than one and one-half times the regular rate is hereby authorized to be paid at such places and to such monthly,

---

[18] Act of June 28, 1940, 54 Stat. 676, 678. This Act expired June 30, 1942.

[19] S. Rep. No. 1863, 76th Cong., 3d Sess., pp. 11–12.

[20] H. Rep. No. 2257, 76th Cong., 3d Sess., pp. 3–4.

[21] Act of October 21, 1940, 54 Stat. 1205. This Act expired June 30, 1942.

per diem, hourly, and piecework employees of the field services of the War Department and the field services of the Panama Canal whose wages are set by wage boards or other wage fixing authorities, . . ."

Such light as we gain from the discussion in Congress indicates that Congress already understood that overtime was payable to certain employes of the Panama Canal by virtue of § 23 of the Act of 1934, but that it was desired to extend the limitation of hours per week and the payment of overtime to employes of the field services of the Army and the field services of the Panama Canal. Thus, in the debate, Mr. Ramspeck, of the House Committee on Civil Service, said: [22]

"The Secretary of War and the Assistant Secretary of War . . . say that they have the legal authority now to pay overtime to certain employees of the War Department in the arsenals and at the Panama Canal, but as to others they have not this authority and this creates a bad administrative situation. They have recommended this bill, which has passed the Senate, and it is my understanding we have given the same authority to the Navy Department as to the Navy yards."

Finally, in 1942, by Joint Resolution, Congress provided for overtime pay for Government employes generally [23] including employes of Government-owned or controlled organizations and those of the District of Columbia whose positions are subject to the Classification Act of 1923. The resolution embodies a proviso excluding "those whose wages are fixed on a daily or hourly basis and adjusted from time to time in accordance with prevailing rates by wage boards or similar administrative authority serving the same purpose, . . ." From this proviso the Government argues that Congress believed that up to that time

---

[22] 86 Cong. Rec. 13557.

[23] 56 Stat. 1068.

those whose monthly compensation was fixed by wage boards had not been entitled to overtime and that the resolution granted it to them for the first time. Whatever Congress may have thought or intended in respect of the proviso, we cannot ignore the fact that § 23 of the Act of March 28, 1934, on its face, applied to such monthly employes, that the Comptroller had so ruled, and that, so far as appears, the departments concerned had acted with that understanding, save only the Governor of the Panama Canal who, although so advised, had acted in the teeth of the statute.

The same misapprehension with respect to the effect and administration of the Act of 1934 seems to have prevailed when the War Overtime Pay Act of 1943 [24] was adopted. That Act, by a sweeping provision, granted overtime pay to all civil employes of the Government and all employes of Government-owned or controlled corporations, except those in the Government Printing Office and the Tennessee Valley Authority. It specifically included *officers* and employes whose wages are fixed on a monthly or yearly basis by wage boards or similar authorities, and excluded employes whose wages are fixed on a daily or hourly basis by wage boards.

We think this summary of the legislation on the subject is not conclusive or even strongly persuasive as an aid to the construction of the Act under consideration as of the time when Congress adopted it. It seems that there was no very clear and general policy with respect to the payment of overtime until the exigencies of the war called for compensation of Government employes as a class on a basis similar to that adopted in private industry. When the time came to make such general provision, the more or less haphazard dealing with the subject theretofore seems not to have been clearly in mind.

---

[24] Act of May 7, 1943, 57 Stat. 75, § 1.

We conclude that the Court of Claims properly held that § 23 applies in respondent's case and that he is entitled to recover for the overtime he was required to work.

We reach then the question whether the court adopted the correct method of calculating the overtime compensation. The respondent submitted a computation whereby he multiplied his monthly salary by twelve and divided the result by fifty-two to ascertain his weekly salary. He divided the weekly salary by five to obtain his daily pay for an 8-hour day for each week that he had worked a sixth day. He took the number of weeks in which he had worked a sixth day and multiplied that number by the ascertained daily wage, plus one-half. The Government argued in the court below, and argues in this court, that the monthly wage of the respondent covered every day of the month because the Government hired his full time. As a result, it is said, his daily pay should be one-thirtieth of his monthly pay.[25] In this view, he has been paid straight time not only for the five days, or the forty hours, he should have been worked under § 23 but also for the sixth day he was required to serve. The result is that he should be granted only additional half pay for the sixth day of each week. But, according to this contention, the respondent will already have been overpaid for, according to the argument, he has been paid straight time for the seventh day of each week although he only worked six days and has, therefore, received additional overtime pay for the sixth day. The court below approved the respondent's method of reckoning and we think its decision correct. After the adoption of § 23 the respondent was in

[25] The Government relies on the Act of June 30, 1906, 34 Stat. 763, 5 U. S. C. 84. That statute, however, was not addressed to the problem of a standard work week of a limited number of hours and the calculation of overtime for hours worked in excess of the limit.

effect hired for a work week of forty hours, or a five-day week, and his daily wage was to be determined on that basis. He has not been paid for the sixth day of each week and should recover straight time and one-half for the sixth day. This computation accomplishes this, and there is authority for resort to it.[26]

The judgment is

*Affirmed.*

Mr. Justice Murphy concurs in the result.

The Chief Justice, Mr. Justice Jackson and Mr. Justice Rutledge dissent.

---

[26] See *St. John* v. *Brown; Allen* v. *Moe, supra,* Note 10.