Spencer M. ANDERSON et al., Plaintiffs,

v.

PANAMA CANAL COMPANY, a Federally Chartered Corporation, Defendant.

Arthur MORGAN et al., Plaintiffs,

v.

PANAMA CANAL COMPANY, a Federally Chartered Corporation, Defendant.

Civ. Nos. 4784, 4797.

District Court, Canal Zone Division of Balboa.

April 21, 1961.

William S. Tyson, Washington, D. C., and Van Siclen & Ramirez, Balboa, Canal Zone, for plaintiffs.

General Counsel of Panama Canal Co., Paul A. Bentz, Balboa Heights, Canal Zone, chief counsel, David J. Markun, Dwight A. McKabney, Theodore P. Daly, Balboa Heights, Canal Zone, Thomas J. Oliver, Rochester, N. Y., trial attys., for Panama Canal Co.

CROWE, District Judge.

These findings are made a part of and are in addition to the opinion of the Court and are made from the Stipulation of Facts filed by counsel and from submissions of proposed findings by each party.

In accordance with this plan, the Court finds that:

1. The defendant, Panama Canal Company, is a corporate agency and instrumentality of the Government of the United States of America, created by the Panama Canal Company Act, which act constitutes article 3 of chapter 12 of title 2, Canal Zone Code, consisting of sections 245 to 258 of said title 2, enacted June 29, 1948, c. 706, sec. 2, 62 Stat. 1076, and amended by Act of September 26, 1950, c. 1049, 64 Stat. 1041; that the aforesaid Company is successor to the Panama Railroad Company which was incorporated by private interests under an act of the State of New York passed April 7, 1849, and which latter Company was wholly owned by the United States of America from the year 1905 until that Company's dissolution as a New York corporate entity on June 30, 1948.

2. Spencer M. Anderson, Arthur Morgan, and all other plaintiffs named in the above entitled suits (Civil Nos. 4784 and 4797) have been regularly employed at hourly rates of pay by the defendant Panama Canal Company for all or a part of the time since January 5, 1956; that such employment has consisted of duties aboard floating equipment of the defendant operated by its Dredging Division; and that such floating equipment has included but was not limited to a pipeline suction dredge, a dipper dredge, two small tugboats, and several launches of varying sizes.

3. Spencer M. Anderson, Arthur Morgan, and all other plaintiffs named in the above-entitled suits (Civil Nos. 4784 and 4797), obtained their positions with defendant Panama Canal Company or with The Panama Canal and were appointed to such positions by authority of the Governor of The Panama Canal (if employed prior to July 1, 1951) or the President of the defendant Panama Canal Company (if employed subsequent to June 30, 1951) after their applications for employment had been approved.

4. Pursuant to the Act of September 26, 1950 (64 Stat. 1041), and Executive Order 10263 of June 29, 1951, U.S.Code Congressional and Administrative Service 1951, p. 1050, issued thereunder, there were transferred from the employ of The Panama Canal, now designated Canal Zone Government, to the defendant Panama Canal Company, a total of approximately 10,150 employees, including all of the 171 parties plaintiff in these actions who were employed by The Panama Canal as of June 30, 1951; that the employees transferred as aforesaid had immediately prior to July 1, 1951 performed a wide variety of jobs and functions related to the operation and maintenance of the Panama Canal as a waterway, and to its incidental business activities in the Canal Zone involving services, supply, public utilities, repair and construction, and the maintenance of housing facilities; that upon transfer and immediately subsequent thereto they continued to perform the variety of jobs and functions as aforesaid subject to the control and on behalf of the defendant Panama Canal Company.

5. The scope and general nature of the duties to which the plaintiffs were or might have been assigned by defendant since January 5, 1956 are set forth in the defendant's position descriptions for such employees which may be introduced into evidence either by plaintiffs or defendant at the trial of these actions upon agreement between the parties as to the authenticity of the copies offered.

6. None of the positions occupied by any of the plaintiffs during the period of their employment referred to in paragraph 2 above, have been classified positions under the Classification Act of 1949, 63 Stat. 954, 5 U.S.C. §§ 1071–1153, 5 U.S.C.A. §§ 1071–1153, as amended.

7. The plaintiffs in these suits have been employed by the defendant, during all or a portion of the period for which

claim is made, in positions falling into four principal categories, as follows:

*Category A*—Officers and crew members of the Dredge U. S. Mindi (a 5,000-horsepower, non-self-propelled, cutterhead, pipeline suction dredge with 28-inch discharge) or of the U. S. Mandinga (a 330-horsepower, non-self-propelled, cutterhead, pipeline suction dredge with 10-inch discharge). The plaintiffs who have served since January 5, 1956 in this category are shown below, designated by the order number in which their names appear in the captions of the two complaints filed herein:

Civil No. 4784—Numbers 1–3, 5–11, 13, 17, 19, 20, 24, 26–36, 39, 43–45, 49, 55, 57–59, 61, 63–67, 69, 71, 73–76, 80, 82–84, 86, 91, 92, 94, 96, 97, 100, 102–105, 107–112, 114, 115, 117, 118, 122, 124–127, 129, 130, 133, 134, 137, 143, 144, 149, 151, 152, 154, 156–158.

Civil No. 4797—Number 6.

*Category B*—Officers and crew members of the Dredge U. S. Cascadas (a 15 cubic yard, non-self-propelled, steam, dipper dredge). The plaintiffs who have served since January 5, 1956 in this category are shown below, designated by the order number in which their names appear in the captions of the two complaints filed herein:

Civil No. 4784—Numbers 4, 5, 9, 12–16, 18, 19, 21, 23, 26, 28, 31, 35–38, 40–42, 47, 48, 50–53, 56, 60, 62, 70, 72, 77, 79, 81, 85, 87, 88, 93, 99, 101, 106, 113, 116, 119, 121, 123, 128, 131, 135, 136, 140–142, 145–147, 153. (Also Gregor Gramlich whose name does not appear in the caption but who was joined as party plaintiff on April 24, 1959.)

Civil No. 4797—Numbers 1–3, 7, 9, 11.

*Category C*—Officers and crew members of the U. S. Chame and the U. S. Diablo, (small tugboats of steel, welded construction—each licensed for 33 passengers and a crew of 5, with length of 53 feet 6 inches, beam of 14 feet 8 inches, depth of 7 feet 3 inches, displacement of 70 long tons, and powered by one 6-cylinder, 200-horsepower, diesel engine) and of the U. S. Siri (a watchboat of steel,

welded construction—licensed for 65 passengers and a crew of 4, with approximate dimensions of 65 feet in length, 15 feet in beam, and 6½ feet in depth, displacing 60 long tons, and powered by two 65-horsepower diesel engines). The plaintiffs who have served since January 5, 1956 in this category are shown below, designated by the order number in which their names appear in the captions of the two complaints filed herein.

Civil No. 4784—Numbers 22, 25, and 78.

*Category D*—Operators and crew members of various Dredging Division launches representative of which are the U. S. Sawfish and U. S. Trout (launches of wood construction—each one licensed for 40 passengers and a crew of 2, with approximate dimensions of 40 feet in length, 11 feet in beam, and 5 feet in depth, displacing about 11½ and 13 long tons, respectively, and powered by 6-cylinder diesel engines of 100 and 165 horsepower, respectively). The plaintiffs who have served since January 5, 1956 in this category are shown below, designated by the order number in which their names appear in the captions of the two complaints filed herein:

Civil No. 4784—Numbers 46, 54, 68, 89, 90, 95, 98, 120, 132, 138, 139, 148, and 155.

Civil No. 4797—Numbers 4, 5, 8, 10, and 12.

8. The plaintiff Egbert F. R. Watson, appearing as the 150th name in the caption on the complaint in the case designated Civil No. 4784, has not been employed since January 5, 1956 in any of the categories of defendant's Dredging Division employees described in paragraph 7 above. The said plaintiff Watson since the date aforesaid has been employed in defendant's Engineering Division (Hydrographic Section) and for a portion of that time he has performed the duties of a leadsman taking soundings from a small boat. In order to reach the places where such work is performed, he was assigned for a part of the claim period to work with the U. S. Mindi; there-

fore, for such period his status was similar to that of employees in Category A, as set out in paragraph 7 above.

9. The plaintiffs who are citizens of the United States are those designated below by the order number in which their names appear in the captions of the two complaints filed herein:

Civil No. 4784—Numbers 1–9, 11–29, 31–36, 80. (Also Gregor Gramlich whose name does not appear in the caption but who was joined as party plaintiff on April 24, 1959).

Civil No. 4797—Numbers 1, 2 and 3. The remaining plaintiffs, not designated above, are neither citizens nor nationals of the United States.

10. The plaintiff Oscar Oliver Jones, appearing as the 7th named in the caption on the complaint in the case designated Civil No. 4797, died on May 12, 1958, at which time he was in defendant's employ.

11. The following plaintiffs, with respect to whose claims defendant asserts the defense of *res judicata*, were parties plaintiff in the United States Court of Claims in actions brought against the United States to recover additional compensation for periods of employment with The Panama Canal prior to 1951 and to their transfer to the employ of defendant, and those actions were based upon an asserted statutory right arising from Section 23 of the Act of March 28, 1934, 48 Stat. 522, 5 U.S.C. § 673c, 5 U.S.C.A. § 673c:

| Name | Case No. | Reported | Amount of Judgment |
|---|---|---|---|
| Bartholomew, Wm. F. | 46048 | 113 Ct. Cl. 680(1949) | $3,486.79 |
| " " " | 48723 | 113 Ct. Cl. 680(1949) | 230.32 |
| Bleakley, Edmund T. | 45474 | 113 Ct. Cl. 680(1949) | 3,759.36 |
| " " " | 47683 | 113 Ct. Cl. 680(1949) | 1,091.41 |
| Gramlich, Gregor | 45102 | 109 Ct. Cl. 857(1947) | 5,386.26 |
| " " | 47230 | 113 Ct. Cl. 679(1949) | 1,643.53 |
| Morgan, Arthur | 45115 | 109 Ct. Cl. 857(1947) | 5,795.90 |
| " " | 47256 | 112 Ct. Cl. 583(1949) | 1,650.08 |
| Russon, Wm. L. | 45292 | 113 Ct. Cl. 680(1949) | 4,830.14 |
| " " " | 47350 | 113 Ct. Cl. 680(1949) | 1,290.48 |
| Suddaby, George D. | 45126 | 109 Ct. Cl. 858(1947) | 4,722.18 |
| " " " | 47252 | 113 Ct. Cl. 682(1949) | 1,481.36 |

No formal opinions were rendered in the above-listed Court of Claims cases and judgments were entered on authority of the case of United States v. Townsley, 323 U.S. 557, 65 S.Ct. 413, 89 L.Ed. 454; the case of Hearne v. United States, 68 F.Supp. 786, 107 Ct.Cl. 335, certiorari denied 331 U.S. 858, 67 S.Ct. 1752, 91 L.Ed. 1865; the case of Gray v. United States, 76 F.Supp. 102, 110 Ct.Cl. 661; and upon stipulations of the parties.

12. The names of the plaintiffs listed below in the left-hand column are misspelled in the complaints; the correct spelling is shown in the right-hand column, as follows:

| Name as Shown | Correct Name |
|---|---|
| Cornelius T. Askew | Camillus T. Askew |
| Alfred Bramfield | Alfred Brameld |
| E. Chandiere | E. Chaudiere |
| Felix Fabarin | Felix Tabarin |
| Santiago Lopex P. | Santiago Lopez P. |

13. The description of defendant's operations with reference to numbered mile points along the waterway, whenever used, is based upon the following data:

(a) Mile 0 shall be the point known as "Station Zero plus Zero Zero (0+00)" under the established system used by defendant for designating exact location in the Panama Canal. Station 0+00 is located on the axis of the Canal at a point 3,341.06 feet south of the intersection of the Canal axis (produced northward) with a line between the east and west breakwater lights at the northerly end of Limon Bay. The coordinates of Station 0+00, referred to the Panama-Colon datum of the Canal Zone Triangulation System are as follows: Latitude – 9° 22′+5,002.4 feet; longitude – 79° 55′+1,842.5 feet.

(b) From Mile 0 described above proceeding in a southerly and southeasterly direction, the numbered mile points are those lying successively along the Canal axis designated Mile 1, Mile 2, etc. through Mile 50, a point lying to the south and west of Flamenco Island in Panama Bay.

14. Defendant's dredging operations since January 5, 1956 have been conducted in the Canal channel, and in adjoining anchorages and other waters along or parallel to it, at the following locations:

From Mile 0 to Mile 7;
From Mile 17½ to Mile 39½;
From Mile 40¼ to Mile 41¾; and
From Mile 42½ to Mile 50½.

15. In order to reach the floating equipment to which they were assigned for duty, plaintiff employees, whenever the vessel in question was not tied up alongside a pier, landing, or other accessible and convenient location on the shore, have generally traveled by launch, watchboat, or small tug to and from their duty stations afloat.

16. The cost of operating its water-borne conveyances for accomplishing the travel described in paragraph 15 has been borne entirely by defendant.

17. Various departure points for the travel by water-borne conveyances have been used and such points have been determined by the particular location in Canal Zone waters of the units of floating equipment concerned at the time in question. The principal and most commonly used departure points for such travel by water, identified by general reference to the numbered mile points along the Canal axis nearest to which they lie, are the following:

(a) The landing in the vicinity of Pier No. 10 at Cristobal East of Mile 2.

(b) The Mindi explosives dock located west of the old French canal and on the present waterway at a point east of Mile 5.

(c) The Fort Davis landing located on the east bank of the Canal at approximately Mile 6¼.

(d) The watchboat landing of the Dredging Division at Gamboa at Mile 30½.

(e) The Paraiso landing at Mile 39½.

(f) The landing at the Pedro Miguel Yacht Club at Mile 40¼.

(g) The old ferry landing at Mile 41½.

(h) The landing near the town of Diablo at Mile 44½.

(i) The Balboa Yacht Club landing at Mile 47.

(j) The Mine Dock on the causeway at Fort Amador at Mile 49.

18. The defendant's vessels upon which the plaintiffs were ordinarily transported between the shore and the floating equipment consisted of a watchboat, launches, and small tugs that were variously capable of, and were usually operated while laden at, average cruising speeds ranging from 8 miles per hour to 10 miles per hour.

19. In order to reach the departure points where travel by water to the floating equipment was commenced, plaintiff employees have traveled overland from their permanent residences or temporary quarters either by walking or by use of various conveyances, as follows:

(a) When the defendant's dredges have been operated north of Gatun Locks (Mile 7), defendant has furnished, without cost to its employees, round trip rail transportation to Cristobal from Gamboa and other points south. This transportation has been provided on official passes (not to exceed two round trips per week) issued for the Panama Railroad, which is operated by a division of the defendant Company other than its Dredging Division. When the departure point for travel by water has been the Mindi explosives dock (Mile 5) or the Fort Davis landing (Mile 6¼), the defendant has furnished, without cost to its employees, the means for accomplishing land travel between a central pickup point in Cristobal and such departure point.

(b) When the departure point for travel by water has been the Dredging Division watchboat landing at Gamboa (Mile 30½), the land travel has been arranged for and provided by the plaintiffs themselves and the defendant has furnished no official transportation for such purposes.

(c) When the departure point for travel by water has been the Paraiso Landing at Mile 39½, the landing at the Pedro Miguel Yacht Club at Mile 40¼, or the old ferry landing at Mile 41½, the defendant has made available, without cost to its employees, the means for accomplishing land travel between Gamboa and such departure point. Such travel on defendant's conveyances commenced and ended at the residences of the individual plaintiffs who lived in Gamboa, or at a central pickup point in Gamboa.

(d) When the defendant's dredges have been operated south of Miraflores Locks (Mile 42½), the defendant has made available, without cost to its employees, the means for accomplishing land travel between Gamboa and the departure point for travel by water. Such land travel on defendant's conveyances commenced and ended (1) at the residences of the individual plaintiffs who lived in Gamboa, or (2) at a central pickup point in Gamboa, or (3) at intermediate pickup points between Gamboa and the departure point for travel by water.

(e) All overland transportation described in subparagraphs (a), (c), and (d) above, except that by rail, has been provided in defendant's official cars and buses designed for the carrying of passengers.

(f) Notwithstanding the foregoing provisions, plaintiff employees in many instances have accomplished such overland travel by means of privately-owned passenger vehicles or by utilizing public transportation facilities.

20. When the defendant's dredges have been operated at the Atlantic end of the waterway north of Gatun Locks (Mile 7), the water travel by plaintiffs to the vessel in question has commenced at one of three departure points and has required, each way, minimum and maximum periods of time under way, as follows:

(a) When dredging occurred between Mile 0 and Mile 4½, the water travel commenced at the landing in the vicinity of Pier No. 10 at Cristobal (Mile 2) and required a minimum period of 5 minutes time and a maximum of 50 minutes.

(b) When dredging occurred between Mile 4½ and Mile 6, the water travel commenced at the Mindi explosives dock (Mile 5) and required a minimum of 5 minutes time and a maximum of 15 minutes.

(c) When dredging occurred between Mile 6 and Mile 7, the water travel commenced at the Fort Davis landing (Mile 6¼) and required a minimum period of 5 minutes time and a maximum of 15 minutes.

21. When the defendant's dredges have been operated in Gatun Lake or Gaillard Cut between Barro Colorado Island (Mile 17½) and Pedro Miguel Locks (Mile 40), the water travel by plaintiffs to the vessel in question has commenced at one of two departure points and has required, each way, minimum and maximum periods of time underway, as follows:

(a) When dredging occurred between Mile 17½ and Mile 30½, the water travel commenced at the Dredging Division watchboat landing (Mile 30½) and required a minimum period of 5 minutes time and a maximum of 1 hour and 15 minutes.

(b) When dredging occurred between Mile 30½ and Gold Hill at Mile 37½, the water travel commenced at the Dredging Division watchboat landing (Mile 30½) and required a minimum period of 5 minutes time and a maximum of 45 minutes.

(c) When dredging occurred between Gold Hill (Mile 37½) and Pedro Miguel Locks (Mile 40), the water travel commenced at the Paraiso landing (Mile 39½) and required a minimum period of 5 minutes time and a maximum of 15 minutes.

22. When defendant's dredges have been operated in Miraflores Lake between Pedro Miguel Locks (Mile 40¼) and Miraflores Locks (Mile 41¾), the water travel by plaintiffs has commenced at either the landing at the Pedro Miguel Yacht Club (Mile 40¼) or at the old ferry landing (Mile 41½), whichever was nearer the work site, and has required each way a minimum period under way of 5 minutes time and a maximum period under way of 15 minutes, depending upon the location of the dredge in question.

23. When defendant's dredges have been operated at the Pacific end of the waterway between Miraflores Locks (Mile 42½) and Mile 50½, the water travel by plaintiffs to the vessel in question has commenced at one of three departure points and has required, each way, minimum and maximum periods of time underway, as follows:

(a) When dredging occurred between Miraflores Locks (Mile 42½) and Thatcher Ferry (Mile 46½), the water travel commenced at the Diablo landing (Mile 44½) and required a minimum period of 5 minutes time and a maximum of 15 minutes.

(b) When dredging occurred between Mile 46½ and Mile 48, the water travel commenced at the landing at the Balboa Yacht Club (Mile 47) and required a minimum period of 5 minutes time and a maximum of 15 minutes.

(c) When dredging occurred between Mile 48 and Mile 50½, the water travel commenced at the Mine Dock (Mile 49) and required a minimum period of 5 minutes time and a maximum of 30 minutes.

24. At all times relevant to this suit, plaintiffs' regularly-scheduled work shifts (hereinafter also referred to as watches) have extended from 7:00 a. m. to 3:00 p. m., from 3:00 p. m. to 11:00 p. m., and from 11:00 p. m. to 7:00 a. m. However, exceptions to that schedule have frequently occurred when certain conditions obtained. Such exceptions included, but were not limited to, the following:

(a) Periods when the Dredge U. S. Mindi has been operated south of Mile 17½ in the vicinity of Barro Colorado Island, at which times the scheduled work shifts were changed to commence at 8-hour intervals beginning at 8:00 a. m. each day, in order to provide for a more convenient morning departure time from the Dredging Division landing at Gamboa (Mile 30½).

(b) Periods when the defendant's dipper dredge Cascadas has been operated south of Miraflores Locks (Mile 42½) at which times, due to tide conditions, it is necessary to schedule the two digging watches to commence four hours before and to continue until four hours after the twice-daily low tides. As to such periods, however, the watches for the officers and crew of the engine room remain on the regular schedule of three 8-hour shifts commencing at 7:00 a. m. daily.

(c) Periods when the defendant's dredges have been operated north of Gatun Locks (Mile 7), at which times the scheduled watches have been adjusted for the convenience of the employees to permit travel by railroad from Gamboa and other points to the south, e. g., the watch on Monday may be set to begin at 9:00 a. m. instead of 7:00 a. m., to accommodate personnel who have spent the week-

end at their homes in Gamboa or to the southward.

25. Throughout the applicable period of the claim, plaintiffs in each case have been compensated by the defendant at their regular hourly rates for 40 hours each week, generally for five daily 8-hour shifts scheduled in the manner described in the paragraph immediately preceding. In addition, the plaintiffs have been compensated at one and one-half times their regular hourly rate for overtime work performed outside their basic administrative workweek of 40 hours. The aforesaid basic and overtime compensation has been paid by defendant for the performance of assigned duties aboard the floating equipment heretofore described. The hours for which compensation has been paid do not include the periods of time during which plaintiffs were being transported aboard land or water-borne conveyances to and from the vessel to which they were assigned for duty, irrespective of whether such transportation has been furnished by the defendant or by the employees themselves.

26. During the period of the claim when the Dredge U. S. Mindi has been operated in the vicinity of Barro Colorado Island south of Mile 17½ and while this dredge has been operated north of Gatun Locks (Mile 7) in the northern district, the defendant has furnished plaintiffs, free of cost to them, subsistence in kind consisting of two meals per day served aboard the vessel during the 8-hour shift to which they were each assigned for duty.

27. During the period of the claim, when the Dredge U. S. Mindi has been operated north of Gatun Locks (Mile 7) in the northern district, the defendant has paid plaintiffs for each workday that they were assigned to the dredge a subsistence allowance in lieu of serving a third meal to such employees aboard the vessel. During the same period, when the Dredge U. S. Cascadas has been operated north of Gatun Locks (Mile 7) in the northern district, the defendant has paid plaintiffs for each workday that they were assigned to the dredge a subsistence allowance for three meals in lieu of serving food aboard the vessel.

28. During the period of the claim when any of the floating equipment to which plaintiffs were assigned has been operated north of Gatun Locks (Mile 7) in the northern district for more than 24 hours, the defendant has furnished quarters in kind for plaintiffs' use, free of cost to them.

29. The positions aboard floating equipment that have been occupied by those of the plaintiffs who are citizens of the United States, except for that occupied by Mr. Marcelino Figueroa, have been compensated at basic rates generally applicable in the continental United States. Such positions have been designated in defendant's correspondence and wage-fixing data as "U. S.-rate positions". The rates of pay for such positions have been based upon certain rates paid to floating equipment personnel of the Corps of Engineers, U. S. Army, which latter rates have been fixed with reference to prevailing rates for comparable positions in private industry in the United States. Prior to July 1, 1951, the rates for the U. S.-rate positions that are involved in these suits were fixed and adjusted from time to time by the Governor of the Panama Canal after reference to, and upon the recommendation of, the Panama Canal Wage Board. Subsequent to June 30, 1951 and during the period of this claim, such rates have been fixed and adjusted from time to time by the President, Panama Canal Company, after reference to, and upon the recommendation of, the Panama Canal Company Wage Board.

30. The positions aboard floating equipment that have been occupied by those of the plaintiffs who are not citizens of the United States and that occupied by Mr. Marcelino Figueroa have been designated in defendant's correspondence and wage-fixing data as "local-rate positions". The rates of pay for such positions have been based, among other wage-determining factors, upon local prevailing pay rates. Prior to July 1, 1951, the rates for the local-rate posi-

tions that are involved in these suits were fixed and adjusted from time to time by the Governor of The Panama Canal after review by, and upon the recommendation of, his staff assistants. Subsequent to June 30, 1951 and during the period of this claim, such rates have been fixed and adjusted from time to time by the President, Panama Canal Company, after review by, and upon the recommendation of, his staff assistants. The basic compensation for such local-rate positions on floating equipment has not at any time been referred to or considered by the Panama Canal Wage Board or the Panama Canal Company Wage Board.

From the proposed findings of fact submitted by the plaintiffs, the Court finds the following:

1. Defendant has failed to pay compensation to plaintiffs for the time they have spent travelling in its land or water-borne conveyances from points at which it directs them to report for transportation to and from their assignments on its floating equipment.

2. The President of defendant Company exercises wage-fixing authority in fixing the basic pay rates of plaintiffs.

3. Plaintiffs employed on the floating equipment of defendant are engaged in the "several trades and occupations" whose compensation is set by wage boards or other wage-fixing authorities.

4. Defendant produced no documentary or other proof establishing that it had ever considered or treated plaintiffs as "maritime employees" for compensation or other purposes.

5. Plaintiffs have at no time been employed in any capacity by the Panama Railroad Company which ceased to exist June 30, 1951.

6. The positions aboard floating equipment occupied by non-citizen plaintiffs, and the position occupied by Marcelino Figueroa, have been compensated by defendant at rates of pay fixed on the basis of several wage-determining factors, including the cost of living. These pay rates are not local prevailing pay rates in the Republic of Panama. There are no similar dredging occupations or prevailing pay rates for such occupations in the Republic of Panama. Staff assistants of the President of defendant Company make recommendations to him with regard to the basic wage rates he fixes for non-citizen plaintiffs.

7. On each day that they have worked on the floating equipment during the period of the claim, plaintiffs at the direction of and at the times specified by defendant have travelled from places designated by defendant to and from such floating equipment by land vehicles or water-borne transportation, or both, owned by defendant, operated by defendant, and under the control of defendant. Orders issued by defendant completely govern the travel of plaintiffs, including their fixed work schedules and reporting places.

8. Plaintiffs have been reprimanded and disciplined by defendant for misconduct or infractions of its rules during the course of their travel.

9. Safety measures and regulations of defendant are enforced during the travel. The supervisor or the senior U. S.-rate employee travelling on conveyances operated by defendant is in charge of enforcing disciplinary, safety, and other rules of defendant while travel is under way.

10. Travel on the motor vehicles of defendant is carried out under cramped and crowded conditions. In the vehicle transporting U. S. wage base employees, those plaintiffs on the back seat of the conveyance travel with their legs "actually jammed up." Non-citizen plaintiffs travel in overcrowded motor vehicles carrying as many as 18 men standing or sitting on uncomfortable, hard wooden seats.

11. The over-water travel on the watchboats, launches and tugs of defendant is performed under extremely crowded and uncomfortable conditions. Frequently seventy to 77 plaintiffs have been carried on water-borne conveyances licensed to carry only 65 persons.

Launches with a maximum capacity of forty persons transport as many as 60. Plaintiffs frequently are forced to stand on the front or the sides of watchboats with no protective railing. There are always plaintiffs standing during the course of the water-borne travel. When the watchboats are crowded there are often more men on board than there are life preservers.

12. The U. S. Chame, used by defendant for transporting plaintiffs, has no railing around its deck for protection. The log book for the U. S. Siri establishes that it transported more plaintiffs than its licensed capacity would permit.

13. Plaintiffs' over-water travel is performed in rough seas, tropical rains and intense fogs. They frequently get wet from rain and spray. It is often performed at night. Obnoxious fumes and excessive noise from the motors on the water-borne conveyances are dangerous and harmful. Embarking upon or disembarking from the water-borne conveyances at the piers or the dredges is hazardous, and so described in the job descriptions of plaintiffs. Absence of any railing makes this even more perilous. The hazards of possible breakage of cables during over-water travel are also listed in the job descriptions of plaintiffs.

14. Plaintiffs are instructed and ordered by defendant to load and unload supplies, parts and equipment on the motor vehicles and water-borne conveyances on which they travel to and from the dredges. These supplies, parts and equipment are loaded at the designated reporting place on motor vehicles which also transport plaintiffs. Upon arrival at the piers, the supplies, parts and equipment are unloaded from the motor vehicles by plaintiffs, who then load them on the water-borne vehicles. Upon arrival at the dredges, plaintiffs unload the supplies, parts and equipment from the water-borne transportation onto the dredges. The same procedure in reverse order is performed by plaintiffs upon the return trip to the designated reporting place. Inflammables, including gasoline, are among the supplies carried on the vehicles which transport plaintiffs and they are required to perform the same loading and unloading operations with respect to such inflammables.

15. Defendant has timekeepers on the launches who check the arrival of plaintiffs.

16. The water-borne conveyances are equipped with radios, and during the travel, instructions and orders are transmitted to and from the dredging office of defendant. As a result of such radio messages, instructions are communicated to plaintiffs by their supervisors concerning details of their duties on board the dredges or upon their return to shore.

17. Accidents have occurred during the course of the travel. Plaintiffs have been injured. Both the motor vehicles and water-borne conveyances utilized for transporting plaintiffs have been involved in collisions. Compensation and medical benefits under the Federal Employees Compensation Act (5 U.S.C. § 751, et seq., 5 U.S.C.A. § 751 et seq.) have been paid to employees injured in such accidents.

18. All land and water-borne travel performed by plaintiffs in going to and from the floating equipment of defendant has been accomplished on premises within the jurisdiction of the United States.

19. Public transportation is neither available nor adequate to permit plaintiffs to perform the travel necessary to meet the working schedules fixed by defendant for its dredging operations. Regular schedules for plaintiffs' transportation are fixed by defendant. Public bus schedules do not offer service with sufficient frequency or to places designated by defendant as reporting points or embarkation points to permit plaintiffs to utilize them for meeting defendant's varying work schedules. There is no available public over-water transportation to transport plaintiffs to and from defendant's dredges, which move in a 50-mile range from end to end on the Panama Canal. Furnishing transportation to plaintiffs is both necessary and beneficial

to efficient operation of defendant's dredging facilities. Defendant could not secure a labor force to operate its Dredging Division unless it furnished them transportation.

20. Plaintiffs have no choice with respect to the utilization of the water-borne conveyances furnished by defendant for transporting them to and from the floating equipment of defendant. There is no other transportation available to them to travel to and from the floating equipment of defendant. Likewise, those plaintiffs who neither own nor are able to own motor vehicles are without adequate land transportation unless it is furnished by defendant. Public bus schedules do not operate with sufficient frequency or timeliness to enable them to meet defendant's fixed work schedules. Consequently, plaintiffs have no choice but to use the transportation furnished by defendant. Furthermore defendant would be faced with a labor force unable and inadequate to operate its floating equipment because of lack of means to get to and from its dredges unless it furnished them transportation.

21. The travel performed by plaintiffs consumes substantial amounts of their time. Water-borne travel alone takes from ten minutes to two hours and thirty minutes each day, depending on the location of defendant's dredges. Land travel consumes at least an equal amount of their time each day.

22. Headquarters of the Dredging Division of defendant Company and the official home station of plaintiffs is Gamboa, Canal Zone. The Canal Zone is divided by defendant's regulations into Northern and Southern Districts. The Northern District includes Colon and the area in the Canal Zone to, but not including, Gamboa; the Southern District includes Panama City and the area in the Canal Zone to, and including, Gamboa and the Madden Dam area. An employee's official station is defined as the district within which he normally works. Plaintiffs normally work in the Southern District, as defined by defendant. Plaintiffs are entitled, when working for defendant away from their official home station, to be furnished meals or a subsistence allowance in lieu of meals and quarters. Standardized Government Travel Regulations. This is an obligation of defendant.

23. The dredge continues to operate during the time plaintiffs consume their meals. Plaintiffs carry on the functions of their regular job during the time they eat and *are not* relieved of their responsibilities. In many instances they eat a sandwich with one hand and operate machinery with the other. No set time is allowed for meals. Plaintiffs consume from ten to twenty minutes in eating meals on the dredge.

24. Defendant pays plaintiffs a night differential in addition to their basic pay rates and overtime compensation for working between 6 p. m. and 6 a. m. This payment has been made to plaintiffs at all times since 1953. Night differential payments are made for working during less desirable hours.

25. The limited financial resources of plaintiffs prevent them from furnishing their own transportation because the cost of the motor vehicles and particularly the water-borne transportation necessary to convey them to and from the floating equipment is beyond their means. Launches similar to those of defendant cost at least $50,000, far beyond the financial resources of plaintiffs.

26. Plaintiffs on five days each week regularly work a daily eight-hour schedule on defendant's floating equipment. On each such day they regularly travel from places designated by defendant to and from the floating equipment where they perform their fixed daily schedules.

27. Defendant has acknowledged as hours of work and paid for travel performed by tugboat employees in its Navigation Division. During the past six or seven years more than 100 employees in defendant's Navigation Division have been paid for their travel time. The water-borne conveyances which transport Navigation Division employees during their travel are of the same type as

those used by defendant to transport plaintiffs. The travel performed by the Navigation Division employees is similar, if not identical to that performed by other employees on defendant's floating equipment, including plaintiffs in its Dredging Division.

28. Defendant compensates the Pilots in its Marine Bureau for travel which is similar to the travel of plaintiffs.

29. By recognizing the travel performed by its Navigation Division employees and its Pilots as work, defendant has established a custom and practice of compensating its employees for travel time similar, if not identical, with that performed by plaintiffs.

30. The travel over water performed by plaintiffs is work because it has all of its indicia, including physical or mental exertion, controlled or required by defendant, and pursued necessarily and primarily for the benefit of defendant and its dredging operations.

From the proposed findings of fact submitted by the defendant, the Court finds the following:

1. The dredging work to which plaintiffs have been assigned; the floating equipment aboard which they serve and by means of which the work is done; and the pertinent conditions of their employment are comparable to the dredging work done; the vessels used to accomplish it; and the conditions of employment prescribed by the Army Corps of Engineers and by private dredging companies in the maritime industry in the United States.

2. Plaintiffs called 31 witnesses to give oral testimony; 27 of them were from among the plaintiffs themselves. All of the testimony for plaintiffs presenting the facts on travel conditions, passenger transportation to and from the duty stations on the vessels concerned and labor conditions aboard the floating equipment was given by the 27 plaintiff-witnesses. These 27 all have a direct and personal interest in the outcome of the litigation. No independent or disinterested witnesses were called by plaintiffs to testify as to such facts.

3. The U. S. -rate positions here involve the performance of approximately the same duties for the defendant Company as were prescribed for such positions when they were under the control of the noncorporate agency, The Panama Canal prior to July 1, 1951. Such U. S. -rate positions while under the noncorporate agency were within a class that was held subject to the Thomas Amendment (section 23 of Act of March 28, 1934, 48 Stat. 522, 5 U.S.C. § 673c, 5 U.S.C.A. § 673c) by the Court of Claims. 1st Stip. of Facts, 14; Townsley v. United States, 1944, 101 Ct.Cl. 237, 244–247.

4. On April 8, 1935 the Comptroller General of the United States in decision A-59991 ruled that the Thomas Amendment was not applicable to the defendant (then called Panama Railroad Company). Pursuant to that decision, the defendant since 1935 has considered and treated all its hourly employees as if they were not subject to the Thomas Amendment. The issue as to such applicability to hourly employees has never been litigated.

5. In an Act of July 9, 1937 the Congress, while amending section 81 of title 2, Canal Zone Code, inserted a proviso to the effect that nothing in the section should affect the applicability of the Thomas Amendment to employees of the noncorporate agency, The Panama Canal. Although passing legislation at the same time that also amended the Canal Zone Code and affected the companion agency in the Canal enterprise, i. e., the defendant (then called Panama Railroad Company), the Congress did not then enact and has not since enacted any such proviso with respect to the Company affirming or saving application of the Thomas Amendment.

6. The record contains comprehensive evidence concerning dredging work done by two noncorporate federal agencies, the Mississippi River Commission and the United States Army Corps of Engineers, Lower Mississippi Valley Division, which in pertinent part is as follows:

(a) the geographical area involved is the Mississippi watershed and Gulf of Mexico coast in seven states covering 1,100 miles of main stream from St. Louis, Missouri, to New Orleans and the Gulf plus various tributaries and the Gulf Intercoastal Waterway across Louisiana to the boundary of the Mobile District;

(b) the number of civilian employees ranges from 4,500 to 6,500 of whom about 1,850 are on floating equipment;

(c) the Division operates nine dredges and various steam boats, towboats, work boats and launches totaling over a thousand pieces of floating equipment;

(d) the principal mission of the River Commission and the Division is dredging work for purposes of flood control and navigation;

(e) the floating plant in the area in question consists of one-half of that operated by the Corps of Engineers in the United States;

(f) transportation by water-borne conveyance between shore points and the vessels to which they are assigned for duty is furnished employees free of cost by the Division;

(g) one-way, water travel to or from the floating equipment requires from a minimum of three to five minutes to a maximum of three hours or more;

(h) the launches furnished for the aforesaid water travel are not designed primarily as passenger vessels but instead are supply boats;

(i) employees are transported at the same time supplies are carried and they sometimes perform the work of loading those supplies;

(j) the Division does not require its employees to use the launches and tenders it furnishes for transporting them to their duty stations but ordinarily such transportation is the only available means of travel; and

(k) the time spent in such travel is treated as noncompensable and is not included in the employees' recorded hours of work time.

7. The record contains comprehensive evidence concerning dredging work done by McWilliams Dredging Company, one of the six largest commercial dredging companies in the private maritime industry of the United States, which in pertinent part is as follows:

(a) the geographical area involved is 1,100 miles of the Mississippi River from New Orleans south to the Gulf of Mexico, 1,800 miles of the Gulf coast from Brownsville, Texas, to Key West, Florida, and 800 miles of Atlantic coast from Key West, Florida to Wilmington, North Carolina;

(b) the number of employees involved ranges from 400 to 550;

(c) the dredging company operates six dredges and forty-two other major units of floating equipment;

(d) the work done by the company consists of hydraulic dredging projects for flood control, navigation channels, land reclamation, major river crossings for pipelines, airfields and other purposes;

(e) the company does principally contract work obtained through competitive bidding and such work is done for private companies, for the Corps of Engineers, U. S. Army, and for other governmental agencies;

(f) the company's floating equipment employees are paid at the rate of time and one-half for all work in excess of 40 hours per week (that is also the general practice throughout the dredging industry in the geographical area where this company works);

(g) transportation by water-borne conveyance between shore points and the vessels to which they are assigned is furnished employees free of cost by the company;

(h) one-way, water travel to or from the floating equipment requires from five minutes to three hours with the average, normal, maximum time being one hour;

(i) the conveyances furnished for the aforesaid water travel are of several types including small diesel-powered launches with 20 passenger seats, dredge-

tending tugs without passenger seating space except temporary benches on the open after deck, and hired crew boats operated by contractors for trips exceeding eight to ten miles;

(j) the employees are transported at the same time small supplies, repair parts, material, groceries, and laundry are carried and these employees assist in loading such supplies;

(k) the company does not require its employees to use the launches, tenders or crew boats it furnishes for transporting them to their duty stations but such transportation is ordinarily the only means available;

(l) the travel is sometimes performed under adverse weather conditions and there are circumstances in which employees while traveling become wet due to lack of complete cover from the rain;

(m) the company treats injuries incurred on board its boats used for transporting personnel as if they occurred during regular work shifts even though the employees are not considered to be on duty; and

(n) the time spent by the employees in traveling to and from the company's floating equipment is treated as noncompensable and is not included in the employees' recorded hours of work time. This practice of treating travel time as noncompensable is followed generally by the commercial dredging companies throughout the Gulf coast area. There is no evidence of any practice in the maritime industry at variance with that aforesaid.

8. It is established that travel by employees to and from the floating equipment to which they are assigned for duty is not considered work time by either the Corps of Engineers, U. S. Army, or commercial dredging companies in the private maritime industry.

9. The defendant, upon assuming responsibility for most of the Canal operation on July 1, 1951, continued to maintain the Wage Board that had theretofore been an activity of The Panama Canal consisting of an employee member and a management member. The defendant as a matter of convenience and sound personnel policy has utilized this existing Wage Board (which ordinarily deals with the rates for land-based trade and craft employees) to make recommendations regarding wages for its vessel employees on floating equipment rather than establishing a separate board to handle that specific group of jobs.

10. Plaintiffs who are local-rate employees have always been treated for wage purposes as a group separate from those plaintiffs who are U. S.-rate employees.

11. The Comptroller General of the United States ruled that the Thomas Amendment did not apply to the local-rate employees of the noncorporate Canal agency on April 12, 1934. 14 Comp.Gen. 156, 158. The same officer specifically confirmed the 1934 decision in his ruling B-48393 of February 13, 1948 when he held that neither the Townsley nor Hearne cases served to bring local-rate employees within the coverage of the Thomas Amendment. United States v. Townsley, 1945, 323 U.S. 557, 65 S.Ct. 413, 89 L.Ed. 454; Hearne v. United States, 1946, 68 F.Supp. 786, 107 Ct.Cl. 335.

12. Plaintiffs receive their pay checks aboard the dredges or other vessels where they work and not at the place where they board the land or water-borne conveyances furnished to transport them to the place of work.

13. Plaintiffs do not usually carry tools with them while traveling to work. The individual plaintiffs who are local-rate employees have occasionally loaded ice, supplies and small parts aboard the motor vehicles and launches they traveled on but never more than four men, and usually only one or two, from a group of 18 to 40 men on a given trip would perform such loading.

14. The land travel involved here is not performed under uncomfortable or unpleasant circumstances and it does not involve any greater risk than that faced by any other worker in traveling between his home and his work.

15. There is expert testimony that the water-borne conveyances furnished by defendant to transport plaintiffs to their duty stations are adequate and suitable for the purpose employed based upon recognized safety standards applicable to operation, manning, licensing of operators, inspections for seaworthiness and to the nature and quantity of safety gear and equipment.

16. Defendant has allowed plaintiffs in every eight-hour work shift two periods of from ten to thirty minutes each for the purpose of eating their meals and the majority of plaintiffs upon the ringing of a dinner gong have left their place of duty on the dredge and gone to the messhall or dining room to eat.

17. The cost to the defendant of furnishing plaintiffs and employees similarly situated with certain benefits in addition to their regular and overtime compensation and free transportation by water to the dredges is as follows for the period from January 1956 to July 1959:

| Benefit or Service | Amount |
| --- | --- |
| Motor Transportation | $ 39,895.46 |
| Railroad Transportation | 19,009.16 |
| Living Quarters | 27,121.42 |
| Meal Reimbursement, U. S.-rate | 19,119.22 |
| Meal Reimbursement, Local-rate | 35,204.00 |
| Subsistence in kind | 42,195.01 |
| Total | $182,544.27 |

18. During the period from March 14, 1940 to June 28, 1948, six of the plaintiffs brought suit and received judgments in the Court of Claims for additional overtime compensation under the Thomas Amendment for periods prior to July 1, 1945 when they were employees of the noncorporate agency, The Panama Canal. The judgments did not include nor did the petitions request payment for travel time as is sought here.

19. During the period from July 26, 1945 to November 16, 1948, fourteen of the plaintiffs filed claims with the Comptroller General and received settlement under the Thomas Amendment for periods prior to July 1, 1945 when they were employees of the noncorporate agency, The Panama Canal. These settlements did not include payment for travel time as is sought here.

### Opinion of the Court

This is an action by 171 plaintiffs jointly under Section 132, Title 4 of the Canal Zone Code. Two actions were filed originally but were consolidated on motion of counsel for the plaintiffs at the pre-trial conference.

The plaintiffs have been regularly employed at hourly rates of pay in the Dredging Division of the defendant, Panama Canal Company. Their employment has consisted of duties aboard the defendant's floating equipment which for the purpose of this action consists of a pipeline suction dredge, a dipper dredge, two small tugboats, and several launches of different sizes.

The plaintiffs obtained their positions with the defendant, Panama Canal Company, or with its predecessor, the Panama Canal, by appointment by authority of the Governor of the Panama Canal, if employed prior to July 1, 1951, or the President of the defendant, if employed subsequent to June 30, 1951.

Pursuant to the Act of September 26, 1950 (64 Stat. 1041), and Executive Order 10263 of June 29, 1951, all of the plaintiffs who were employed by the Panama Canal as of June 30, 1951 were transferred to employment by the defendant.

The plaintiffs are suing to recover wages that they claim are due them under the provisions of Section 23 of the Act of March 28, 1934 (48 Stat. 522, 5 U.S.C. § 673c, 5 U.S.C.A. § 673c) known as the Thomas Amendment and Section 248, Title 2 of the Canal Zone Code, as amended.

None of the positions occupied by plaintiffs during the period embraced by this action has been a classified position under the Classification Act of 1949 (63 Stat. 954, 5 U.S.C. § 1071 et seq., 5 U.S. C.A. § 1071 et seq. as amended.)

The plaintiffs claim that they are entitled to recover additional basic and overtime compensation for time spent by them, before and after regularly scheduled work shifts, in traveling to and from defendant's floating equipment used in the Dredging Division, to which they were assigned for duty, on vehicles and water-borne conveyances furnished and operated by the defendant.

The complaints pray for judgment on behalf of each of the plaintiffs in the sum of $4,500 subject to exact computation.

The period covered by the actions begins on January 5, 1956 in Civil No. 4784 and on February 9, 1956 in Civil No. 4797 and extends to date of judgment.

By agreement the only question under submission at this time is liability. If the defendant is held liable, the matter will be redocketed to determine the amount of damages due plaintiffs.

The question that presents itself to the Court is whether or not the time spent by the plaintiffs in traveling to and from defendant's floating equipment on which the plaintiffs are employed is compensable time.

The traveling is broken into two categories (1) the travel overland in defendant's vehicles to and from the Panama Canal and (2) travel on the canal and contiguous waters under defendant's control in defendant's water-borne conveyances.

In the first instance, I do not feel that the time is compensable, but in the second instance I hold that it is and that the plaintiffs are entitled to recover.

The travel time overland, while in many instances is in defendant's vehicles and passes over the land belonging to defendant and is subject to the direction and control of the defendant, is nevertheless actually a convenience to the plaintiffs as well as to the defendant and does not differ materially from any other travel that millions of persons must make to and from their homes and places of employment throughout the United States and the rest of the world and which has not been regarded as compensable time.

Such travel time varies largely with the will of the worker. He may live in Panama or in various parts of the Canal Zone where he can find suitable housing and although there is proof to the effect that some employees have been ordered to live in certain adjacent areas, this is not universal and plaintiffs are permitted to travel to and from the canal in their own or public vehicles and on foot if they wish. It is established that when the plaintiffs are traveling in defendant's vehicles, they must abide by certain regulations, be at certain points at certain times, and are subject to the hazards of traffic accidents, but these are conditions that affect the wage earners the world over. I do not think that the situation is changed because at times certain tools or supplies are transported in the vehicles with the personnel.

The travel by water-borne craft, owned by the defendant, from the banks of the canal or bay at times and from points designated by the defendant, to its floating equipment which is located at places selected entirely at the will of defendant, is in a different category than that overland.

This travel is closely analogous to that in the case of Tennessee Coal Co. v. Muscoda Local No. 123, 321 U.S. 590, 64 S.Ct. 698, 703, 88 L.Ed. 949, wherein it was said by the Court:

"Viewing the facts of this case as found by both courts below in the light of the foregoing considerations, we are unwilling to conclude that the underground travel in petitioner's iron ore mines cannot be construed as work or employment within the meaning of the Act. The exacting and dangerous conditions in the mine shafts stand as mute, unanswerable proof that the journey from and to the portal involves continuous physical and mental exertion as well as hazards to life and limb. And this compulsory travel occurs entirely on petitioners' prop-

---

erty and is at all times under their strict control and supervision.

"Such travel, furthermore, is not primarily undertaken for the convenience of the miners and bears no relation whatever to their needs or to the distance between their homes and the mines. Rather the travel time is spent for the benefit of the petitioners and their iron ore mining operations."

While traveling over the water in defendant's watch boats, launches, and small tugs the plaintiffs are subject to the discipline and control of the defendant and must follow the safety measures prescribed by defendant. Frequently such travel is accomplished under crowded conditions with inadequate seating space, in rainy, foggy weather and when there are rough seas.

The motors on the vessels are noisy and expel fumes that are obnoxious and disagreeable and plaintiffs are subject to the hazards of embarking and disembarking that at times can be dangerous when the water is rough and when changing from craft to craft because of their varying levels.

While traveling in these conveyances, supplies and tools are transported which are handled by the plaintiffs and instructions are received by radio concerning duties to be performed by them in their work for defendant.

Accidents have occurred during the travel over water and compensation and medical benefits under the Federal Employees Compensation Act (5 U.S.C. § 751 et seq., 5 U.S.C.A. § 751 et seq.) have been awarded to the plaintiff for injuries received in these accidents.

The travel performed is on premises within the jurisdiction of the United States as a result of treaties with the Republic of Panama. It has been held that the United States is the holder of a perfect title to the canal and the Canal Zone. Wilson v. Shaw, 204 U.S. 24, 27 S.Ct. 233, 51 L.Ed. 351. The defendant is a corporation owned completely by the United States and the canal and its waters are entirely under its direction and control.

It is legally permissible to use private launches and small craft for transportation on the canal with defendant's permission, but it has not appeared in the proof that such a procedure would be prudent nor feasible nor that it would fit into defendant's work plans. There is no public transportation on the waterway that would transfer plaintiffs to and from defendant's equipment.

The defendant has introduced much proof to the effect that in dredging as a private industry and in other governmental agencies in the United States and in Panama that travel time over water from the point of embarkation is not compensable time. It will be noted from the proof, however, that in its own Division of Navigation in the operation of its tugs that its custom is to compensate its workers for such time. This employment is in many ways similar to the employment involved in the case at bar. The employees live in various localities and converge at a dock to either board a vessel belonging to the Panama Canal Company or be transferred to it in the company's small craft. Upon completion of the work aboard the tug, they either return to the dock in the tug or are sent to the dock in a smaller vessel. The compensable time begins at the dock when leaving at the beginning of the work shift and terminates upon return to the dock upon ending the shift. This payment is received whether the tug is in the stream or alongside.

The tugs are much like the dredges in that they are owned and controlled by the defendant and operate on defendant's waters.

The defendant assumes the position that Section 23 of the Act of March 28, 1934, 48 Stat. 522, 5 U.S.C. § 673c, 5 U.S.C.A. § 673c and known as the Thomas Amendment, supra, is not applicable to the plaintiffs and it relies heavily on a ruling of the Comptroller General of the United States rendered on April 8, 1935, designated as A–59991 and relative to the claim of one Ernest L. Wood, an hour-

784

ly employee of the Panama Railroad Company.

The Thomas Amendment reads as follows:

"The weekly compensation, minus any general percentage reduction which may be prescribed by Act of Congress, for the several trades and occupations, which is set by wage boards or other wage fixing authorities, shall be reestablished and maintained at rates not lower than necessary to restore the full weekly earnings of such employees in accordance with the full time weekly earnings under the respective wage schedules in effect on June 1, 1932: Provided, That the regular hours of labor shall not be more than forty per week; and all overtime shall be compensated for at the rate of not less than time and one-half."

The Comptroller General ruled that the entire stock of the Panama Railroad Company was owned by the United States but that its employees were not within the category of *federal personnel* in the several trades and professions who were subject to the Thomas Amendment.

Specifically, he stated that:

"While the entire stock of the Panama Railroad Company is now owned by the United States, it has been held by the courts and by the accounting officers of the United States that its employees are not employees of the United States. Panama Railroad Company v. Minnix [5 Cir.], 262 [282] Fed.Rep. 47, 49, decision of this office of August 17, 1928, A–23979."

A careful reading of the Minnix case leads me to a different conclusion. The only thing it decides is that Minnix, a Panama Railroad Company employee, had the right not only to proceed to recover for personal injury under the Federal Employees Compensation Act but he had an alternative right to sue the Panama Railroad Company "as any other railroad company" even though the United States was the sole stockholder.

■ Since the time of the Minnix case and the above decision of the Comptroller General, there has been a complete change in the corporate structure of the Panama Canal entities, and even though the Comptroller General's reasoning may have been correct then, an entirely different organization now exists, and I hold that the plaintiffs are employees embraced by the amendment.

This new organization, the defendant, The Panama Canal Company, was created by the Act of September 26, 1950 as a federally chartered corporation and as an agency and instrumentality of the United States.

In passing on a situation such as is presented here, the Attorney General of the United States decided that employees of a corporation of the United States were employees of the United States in an opinion relating to employees of the Inland Waterways Corporation, in which he said:

"The Reconstruction Finance Corporation was created by the Act of January 22, 1932 (47 Stat. 5, 6 [15 U.S.C.A. § 603]). That Act expressly authorizes the Corporation 'to select, employ, and fix the compensation of such officers, employees, attorneys, and agents as shall be necessary for the transaction of the business of the Corporation, without regard to the provisions of other laws applicable to the employment and compensation of officers or employees of the United States.' The Tennessee Valley Authority Act of 1933 (48 Stat. 58 [16 U.S.C.A. § 831b]), creating the Tennessee Valley Authority, authorizes that Corporation to employ officers and employees necessary for the transaction of its business 'without regard to the provisions of the Civil Service laws applicable to officers and employees of the United States'. Similar provisions have been made by the Congress with reference to the appointment of officers and employees of other corporations subsequently created. See the Act of

June 13, 1933 (48 Stat. 128 [12 U.S.C.A. § 1461 et seq.]), creating the Home Owners' Loan Corporation, and the Act of January 31, 1934 (48 Stat. 344 [12 U.S.C.A. § 1020 et seq.]), creating the Federal Farm Mortgage Corporation. Obviously, the Congress considered that officers and employees of the divers Corporations named are officers and employees of the United States within the meaning of the Civil Service laws, and subject to them unless exempted by statute. I see no reason why a different principle should apply to officers and employees of the Inland Waterways Corporation; and, as before stated, I find no statute exempting them." 39 Op.Atty. Gen. 238.

Further, in the case of Mills v. Panama Canal Company, 2 Cir., 272 F.2d 37, 39, decided November 16, 1959, the court held that the plaintiff, a seaman employed by the Panama Canal Company, was denied the right to proceed under the Merchant Marine Act, commonly referred to as the Jones Act (46 U.S.C.A. § 688), and decided that his remedy as against the company was under the Federal Employees Compensation Act and that the plaintiff became, in effect, an employee of the United States.

"The fact that the government chooses to conduct the affairs relating to the Canal through a corporation does not alter its character as a governmental agency. Cherry Cotton Mills, Inc. v. United States, 1946, 327 U.S. 536, 66 S.Ct. 729, 90 L.Ed. 835, and Federal Crop Ins. Corp. v. Merrill, 1947, 332 U.S. 380, 68 S.Ct. 1, 92 L.Ed. 10. As a result of accepting employment with Panama Canal Company, plaintiff became in effect an employee of the United States and entitled to all the FECA benefits granted to him by congressional enactment."

The plaintiffs have not only not been exempted from the effect of the Thomas Amendment by Congress but the legislative history is that Senator Thomas, its sponsor, argued in the debate on the legislation that it was meant to apply to employees in the Panama Canal Zone. United States v. Townsley, 323 U.S. 557, 65 S.Ct. 413, 89 L.Ed. 454, and page 2977, Vol. 78, Part 3, Congressional Record, 73rd Congress, 2nd Session, February 21, 1934.

As in the Townsley case, the defendant places great reliance on prior practice in the Canal Zone but as held there, I think that the previous administrative practice is of little moment as there has been a complete change in organizational structure of the entities involved, with the obvious intent of Congress to abolish many of the practices and inequities of the old corporation and the old non-corporate agency.

As stated by defendant, this court has previously held in Boyd v. Panama Canal Company, D.C.1958, 160 F.Supp. 50, that where employees were transferred as were the plaintiffs here, from the Panama Canal to the Panama Canal Company, their rights must be determined on the basis of statutes applicable to them in their new employment.

■ Defendant's argument that the plaintiffs are governed by the terms of Section 205 (formerly section 203) of the 1945 Pay Act, 59 Stat. 296, 297, 5 U.S.C. § 913, 5 U.S.C.A. § 913 and are not therefore included in the Thomas Amendment because their basic rate of pay is on an hourly basis instead of an "annual or monthly" basis is fallacious as that act was adopted to implement the provisions of the Thomas Amendment and make it applicable to certain people who were excluded because they were paid on a "monthly or annual" basis. Its purpose was not to exempt or exclude those on a per diem or hourly basis and it had no such effect.

The House of Representatives Report No. 726 on H. R. 3393, which became this statute, states this position clearly on page 12 thereof, as follows:

"Section 203. Wage board employees.—This section covers about 150,000 employees whose basic com-

pensation is fixed and adjusted from time to time on a per annum or monthly basis by wage boards or similar administrative authority serving the same purpose. These employees, except in the Government Printing Office and the Tennessee Valley Authority, were specifically included within the War Overtime Pay Act of 1943, because at that time they were not regarded as falling within the act of March 28, 1934, which provides true time and one-half rates for similar employees paid at hourly or daily rates.

"Since that time, however, the Supreme Court of the United States, in U. S. v. Townsley (323 U.S. 557 [65 S.Ct. 413, 89 L.Ed. 454], Jan. 15, 1945) has decided (1) that section 23 of the act of March 28, 1934, insofar as it applies to overtime pay, covers wage-schedule employees whose base pay is fixed on a monthly basis; and (2) that the proper method of computing such overtime compensation for employees paid on a monthly basis is first to multiply the monthly rate by 12 and divide the product by 260, i. e. 52 times 5. This gives the straight-time daily rate, which is multiplied by 1½ to derive the overtime rate for 1 day of 8 hours.

"The committee believes it to be sound to treat the monthly and per annum wage-schedule employees in the same way as per diem and hourly wage-schedule employees are treated under the act of March 28, 1934. The fundamental criterion should be the method by which the basic rates are established, and differences in overtime pay treatment should not rest on whether such rates are administratively expressed in terms of an hour, a day, a month, or a year.

"Section 203, accordingly, makes monthly and per annum wage-schedule employees, whose basic rates are established by wage board or similar administrative authority with reference to prevailing rates, subject to the overtime pay provision of section 23 of the act of March 28, 1934, which has always applied to similar hourly and per diem wage-schedule employees. It also spells out the same overtime pay computation method as is approved by the Supreme Court in the Townsley case." Page 43, Decision of Comptroller General, Vol. 25.

Defendant's contention that the effect of section 102(d) and 606 of the Federal Employees Pay Act of 1945, as amended, 5 U.S.C. §§ 902(d), 946, 5 U.S. C.A. §§ 902(d), 946 is to exclude plaintiffs is without merit as that act adopted in 1945 and excluding "vessel employees of the Panama Canal Company" and permitting them to be compensated "in accordance with the wage practices of the maritime industry" related to employees on ships operated by the Panama Railroad Company.

Prior to June 30, 1951 plaintiffs were as has been stated, employees not of the "Company" but of the unincorporated entity, the Panama Canal, and Congress in passing specific legislation for "vessel employees" of the Company could not have had them in mind.

A similar question was considered by this court in Boyd v. Panama Canal Company, D.C., 160 F.Supp. 50 when it was raised in relation to defendant's pilot employees wherein it was said:

"The Panama Railroad owned ships, tugs, work boats, launches, dredges, etc., on which there were numerous employees who were intended by Congress to be excluded from the provisions of the act *but certainly the pilots were not contemplated as being among that group for they were not even Panama Railroad Company employees.*" (Italics supplied.)

However, as contended by plaintiffs, I find nothing repugnant in the application of both the Thomas Amendment and Section 102(d) and 606 of the 1945 Pay Act to plaintiffs. In the first they are given an overtime guarantee that is general to all employees fitting the terms

of the act and in the other they "may" be compensated in accordance with wage practices of the maritime industry. It does not necessarily follow that an act setting up the right of defendant to follow a program of payment in accordance with that utilized at sea should deprive plaintiffs of the benefits of an over-all premium pay statute under which they qualify.

Defendant contends further that 133 of plaintiffs occupy or have occupied positions the rates of pay for which have been based upon local prevailing pay rates and they are therefore not wage-board employees within the meaning of the Thomas Amendment and not entitled to its benefits. These people, except for Marcelino Figueroa, are neither citizens nor nationals of the United States.

As established by defendant, there is considerable history of differentiation between United States citizens employed in the Canal Zone and non-citizens so employed. This was based on the premise, false or not, that United States citizens should be paid in accordance with pay scales prevailing in the continental United States and that foreign nationals employed by the United States overseas should be paid in accordance with prevailing native wage rates for the area in which employed.

I am of the opinion that this plan at one time was agreeable to both the governments of the United States and of Panama, although probably the local rater was never happy with it, but now the plan is not only not agreeable but is so repugnant to the two nations that it is their express desire that it be abandoned as is declared in the "Memorandum of Understandings Reached" in negotiating the Treaty of Mutual Understandings and Cooperation with the Republic of Panama, entered into in 1955 by the United States, U. S. Treaties and other International Agreements, Vol. 6, page 2329:

"In connection with the 1953–1954 negotiations between representatives of the United States of America and the Republic of Panama, which have resulted in the signature of a Treaty between the two countries, the following understandings have been reached:

"On the part of the United States of America:

"1. Legislation will be sought which will authorize each agency of the United States Government in the Canal Zone to conform its existing wage practices in the Zone to the following principles:

"(a) The basic wage for any given grade level will be the same for any employee eligible for appointment to the position without regard to whether he is a citizen of the United States or of the Republic of Panama.

"(b) In the case of an employee who is a citizen of the United States, there may be added to the base pay an increment representing an overseas differential plus an allowance for those elements, such as taxes, which operate to reduce the disposable income of such an employee as compared with an employee who is a resident of the area.

"(c) The employee who is a citizen of the United States will also be eligible for greater annual leave benefits and travel allowances because of the necessity for periodic vacations in the United States for recuperation purposes and to maintain contact with the employee's home environment.

"Legislation will be sought to make the Civil Service Retirement Act [5 U.S.C.A. § 2251 et seq.] uniformly applicable to citizens of the United States and of the Republic of Panama employed by the Government of the United States in the Canal Zone.

"The United States will afford equality of opportunity to citizens of Panama for employment in all United States Government positions in the Canal Zone for which they are qualified and in which the employment of United States citizens is not

required, in the judgment of the United States, for security reasons.

"The agencies of the United States Government will evaluate, classify and title all positions in the Canal Zone without regard to the nationality of the incumbent or proposed incumbent.

"Citizens of Panama will be afforded opportunity to participate in such training programs as may be conducted for employees by United States agencies in the Canal Zone."

Acting on the above Memorandum of Understanding attached to the treaty, Congress enacted P.L. 85–550; 72 Stat. 405 entitled Canal Zone-Wage and Employment Practices which implemented the provisions of the Memorandum in the following language:

"Uniform Application of Employment Standards and Rates of Compensation, Sec. 6. The employment standards established under section 4 of this Act and the rates of basic compensation established under section 5 of this Act shall be applied uniformly, within and among all departments, to the respective positions, employees (other than employees who are citizens of the United States and are assigned to work in the Canal Zone on temporary detail), and individuals under consideration for appointment to positions, irrespective of whether the employee or individual concerned is a citizen of the United States or a citizen of the Republic of Panama."

These people are no longer Panama Canal employees but along with about 10,-000 others were transferred to the Panama Canal Company where their status is quite different than it was in the past, and it is now apparent from every move of the United States through Congress and its treaty-making powers that the old differences in wage practices are no longer to be followed.

■ Furthermore, without the new expressed intent on the part of the United States to abolish the double wage stand-ards and in spite of the fact that the parties have stipulated that the rates of pay for such positions as occupied by these people are "based, among other wage-determining factors, upon local prevailing pay rates", I believe that they are entitled to the benefits of Section 23 of the Act of March 28, 1934 in accordance with the Comptroller General's ruling, 26 C.G. 344, concerning aliens and native employees in the Philippine Islands.

"In decision of May 19, 1934, 13 C.G. 370, that Section 23 of the Act of March 28, 1934, 48 Stat. 522, was applicable to employees of Navy Yards and Naval Stations outside the continental limits of the United States who previously had worked the same hours on the same kind of work side by side with American citizen employees, the only difference being that under the schedule of wages then in effect, the alien and native employees received a much lower rate of pay. That decision is applicable whenever alien or native employees are employed (outside the continental limits of the United States) under facts similar to those therein appearing. Generally, it has been held that the salary and wage rates paid alien or native employees (outside the continental limits of the United States) administratively may be adjusted either upward or downward to accord with varying special circumstances and local prevailing wages and living conditions. 10 C. G. 322; 20 id. 552; 21 id. 947; 22 id. 432, 678. Under those decisions the schedule of wages for alien and native employees (outside the continental limits of the United States) whose wages are fixed by the Secretary of the Navy through wage boards or other similar administrative procedure, as provided in the Act of July 16, 1862, 12 Stat. 587, 34 U.S.C. 505, may include rates lower than those contained in a schedule of wages established under authority contained in the same statute for employees generally. However, there

is no authority whereby employees who are otherwise included within the provisions of Section 23 of the Act of March 28, 1934, 48 Stat. 522, may be denied compensation for overtime services performed at a rate of not less than time and one-half. See in this connection Townsley v. U. S., 101 Ct.Cls. 237, which case later was considered by the Supreme Court in 323 U.S. 557 [65 S.Ct. 413]. * * * From the facts stated in your letter, including the history of the employment of this type of individual concerned, I am of the opinion that such employees properly are covered by Section 23 of the Act of March 28, 1934."

Plaintiffs' wages are fixed by the President of the Panama Canal Company. In the case of the plaintiffs who are citizens of the United States, except Marcelino Figueroa, such rates have been fixed and adjusted from time to time after reference to and upon the recommendation of the Panama Canal Company Wage Board. In the case of the plaintiffs who are not citizens of the United States and Marcelino Figueroa, such rates have been fixed and adjusted from time to time after review by and upon the recommendation of the Panama Canal Company President's staff assistants.

In each case it is held that the President of the Company is a "wage fixing authority" within the meaning of the act. Boyd v. Panama Canal Company, supra; Abbott et al. v. United States, 151 F.Supp. 929, 138 Ct.Cl. 459; Poggas v. United States, 93 F.Supp. 1009, 118 Ct.Cl. 385.

The defendant raises the question as to the right of judicial review, contending that this is not available to the plaintiffs for the defendant's action is one of administration within the scope of its statutory authority and subject to defendant's discretion.

■ I agree that the Panama Canal Company under the Canal Zone Code has authority to appoint its officers, agents, attorneys and employees and fix their compensation and define their authority and duties. But I cannot agree that where it is failing to apply applicable statutes in the fixing of its employees' compensation and duties that the employees are without recourse.

The courts have already undertaken to determine whether or not the Thomas Amendment is applicable in the Canal Zone in United States v. Townsley, 323 U.S. 557, 65 S.Ct. 413, wherein Mr. Justice Roberts said in delivering the opinion of the Court:

"The parties agree that the principal question presented is whether Section 23 of the Independent Offices Appropriation Act, 1935, insofar as it provides for over time compensation for services in excess of 40 hours per week, applied to Government employees of the Canal Zone whose compensation is fixed on a monthly basis."

This opinion was written January 15, 1945, a little more than five years before the creation of the corporate agency now called the Panama Canal Company, and at that time the authority to prescribe the duties and compensations rested in the Governor of the non-corporate agency, predecessor in many ways to the defendant. It appears to me that the reasoning in that case is applicable to the case at bar for even though the entity, Panama Canal, has been changed to and included in the defendant, it does not appear that the new corporate organization should be any freer from review by the courts for its failure to comply with statutory provisions than the old structure.

Section 17 of P.L. 85–550 of July 25, 1958, which is the Canal Zone Wage and Employment Practices Act, adopted in accordance with the Memorandum of Understandings attached to the 1955 treaty between the United States and Panama, reads as follows:

"Sec. 17. Nothing contained in this Act shall affect the applicability of—

* * * * * *

"(3) Section 23 of the Independent Offices Appropriations Act, 1935 (48 Stat. 522), as amended, 5 U.S.C. (section 673c), or section 205 of the Federal Employees Pay Act of 1945, as amended (5 U.S.C. 913), to those classes of employees within the scope of such sections 23 and 205 on the date of enactment of this Act."

This provision clearly contemplates a test to determine that the people covered by this act are so included. In the event of wrongful exclusion from the benefits granted, they are entitled to turn to the courts to test their rights to be embraced.

The question of whether or not travel time is compensable time is subject to judicial review. This court has previously entertained the question in Boyd v. Panama Canal Co., supra, and it has been held to be working time in the following decisions of the Supreme Court: Tennessee Coal, Iron & R. Co. v. Muscode Local No. 123, 321 U.S. 590, 64 S.Ct. 698, 88 L.Ed. 949; Jewell Ridge Coal Corp. v. Local No. 6167, U.M.W.A., 325 U.S. 161, 65 S.Ct. 1063, 89 L.Ed. 1534; Anderson v. Mt. Clemens Pottery Co., 328 U.S. 680, 66 S.Ct. 1187, 90 L.Ed. 1515.

■ Defendant's argument that a finding by the court that time spent in travel between their homes and their place of duty are regular hours of labor would be an undertaking that was nonjudicial and an encroachment by the court upon legislative or administrative functions is unsound. To follow such a theory to a final analysis denying the plaintiffs the right to question defendant's rulings in matters of hours of labor would open the road to an ability on the part of the Panama Canal Company to work its employees many hours for which it could arbitrarily refuse payment on the assumption that such employment did not fit within its definition of the term "regular hours of labor."

The language used in the act creating the Panama Canal Company, giving it authority to fix the compensation and define the duties of its officers and employees, does not do other than to grant to it the powers necessary for its intelligent and efficient operation and does not create an all-powerful agency or bureau that can act arbitrarily to the prejudice of its employees without the intervention of the courts.

It is true that Congress did desire to "cut it loose from the United States as far as possible", as stated in Abbott v. U. S., 112 F.Supp. 801, 804, 125 Ct.Cl. 330, but this referred to its management and accounting practices and did not thus place it in such an exalted position that it could disregard applicable acts of Congress nor impose undue burdens and hardships on its personnel without being held accountable in a court of law.

■ It has long been a recognized theory of law that the courts cannot exercise generally supervising power over the proceedings of the administrative department but the failure to allow overtime, when authorized by Congressional enactment, and the failure to compensate for hours spent in labor does not fall within that scope of internal agency management that precludes judicial review.

In Abbott v. U. S., 151 F.Supp. 929, 138 Ct.Cl. 459, 465 when the question as to whether travel time was working time or not, the court without hesitation decided that it was. Defendant's argument that this was merely an extension of the agency determination is without merit for the agency was refusing payment and the court did review the agency's determination and did hold that the agency should pay for the disputed time.

■ The defense of laches cannot be sustained as the cause of action seems to me to have been brought within a reasonable time after the plaintiffs acquired rights under the Thomas Amendment by the reorganization of the Canal Zone operating units. The record shows also that they have been active over a considerable period in claiming from defendant so I do not think they have rested on their rights.

The defendant raises the defense of limitations in the case designated Civil

No. 4797 as plaintiffs were permitted to amend their complaint to change the date of commencement of the claim period from June 30, 1956 to January 31, 1956. The motion was made April 24, 1959 and defendant's position is that the three-year statute applicable in the Canal Zone should not be tolled from the date of the filing of the suit, February 9, 1959, but from the date of the amendment, April 24, 1959.

■ This position cannot be sustained as the general rule is that an amendment when made relates back to the date of the original pleading. Rule 15(c) of the Federal Rules of Civil Procedure, 28 U.S.C.A. although not applicable in the Canal Zone, declares this principle and can well be looked to by this court for guidance. See Boyd v. Panama Canal Co., supra; Independence Shares Corp. v. Deckert, 3 Cir., 108 F.2d 51; Culver v. Bell & Loffland, 9 Cir., 146 F.2d 29.

■ In the cases of Gregor Gramlich, who was permitted to join as plaintiff on April 24, 1959 in Civil No. 4784, filed January 5, 1959, and Oscar Oliver Jones, deceased, by his special administrator, who was permitted to join as plaintiff on April 24, 1959, in Civil No. 4797, filed February 9, 1959, I think that the defense of limitations should lie and the three years should relate back from the date of their entry into the action rather than the date of filing for although the court permitted them to join as plaintiffs and will let them receive the benefits of the class action, I feel that in the application of the statute of limitations they should be penalized for their lack of diligence. Therefore, in the case of Gramlich, that period from January 5, 1956 to April 24, 1956 shall be barred and in the case of Jones, that period from February 9, 1956 to April 24, 1956 shall be barred. See Orloff v. Metropolitan Trust Co., 1941, 17 Cal.2d 484, 110 P.2d 396.

■ That defendant is entitled to set-off and recoupment for the failure to construe the law correctly is that of its agents and if there has been overpayment, the Government is entitled to recover. United States v. Wurtz, 303 U.S. 414, 58 S.Ct. 637, 82 L.Ed. 932; Cabel v. U. S., 1 Cir., 113 F.2d 998; Boyd v. Panama Canal Co., supra.

■ I am of the opinion that the quarters, meals and subsistence were not intended as either basic pay nor overtime compensation and should not be permitted to be used for recoupment. These items were furnished as part of the job in keeping with the practice in federal work and the maritime industries and the fact that they were furnished was not under a misconstruction of the law but part of a well-organized plan to facilitate defendant's work. The same thinking is applicable to the transportation furnished.

The time consumed in eating the meals should not be construed as compensable if it is a well-defined period that includes rest and relief from duties.

■ The proof, however, is that the dredges are in full operation when the meals are eaten and plaintiffs carry on the functions of their work while eating. It is true that benches and eating utensils are provided but apparently these conveniences are used only when their duties are not too pressing for in some instances they eat a sandwich with one hand and operate machinery with another. It seems that the time consumed in eating is only 15 or 20 minutes and the members of the crew are not relieved from their responsibilities even during this period. I therefore hold that there is no showing of a loss of compensable time that would entitle defendant to recover for mealtimes allowed aboard.

This opinion and the findings attached hereto determine the question of liability only as no proof has been taken as to moneys due the plaintiffs. The attorneys for the plaintiffs are directed to prepare an order in accordance with this opinion and the findings and the setting of a date for the determination of the extent of liability and moneys due the plaintiffs for basic time and overtime, together with any sum that may be due the defendant as recoupment, shall be by further orders of this court.